JDJ/ms
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
RITA BAYTSAYEVA,                                    **NOTICE OF MOTION**

                        Plaintiff,                  **09-CV-4874**

        -against-

MAKSIM SHAPIRO and SVETLANA ZIS,

                        Defendants.
--------------------------------------X

S I R S:

    PLEASE TAKE NOTICE that upon the annexed Affirmation of John M. Downing Jr. and upon the exhibits annexed thereto, and upon the Local Rule 3(g) statement herein, and upon the memorandum of law submitted by defendants, the defendants will move this Court at the United States District Court, Eastern District of New York, at the courthouse located at 225 Cadman Plaza East, Brooklyn, New York 11201 before the Honorable Raymond Dearie, on a date to be determined by the court after February 11, 2011, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary judgment in favor of the defendants on the grounds that the plaintiff has not sustained a "serious injury" pursuant to New York Insurance Law § 5102(d) and granting such other and further relief as the Court just and proper.

    PLEASE TAKE FURTHER NOTICE that answering papers, if any, are required to be served by January 28, 2011.

Dated:    New York, New York
          December 29, 2010

Yours, etc.,

JOHN M. DOWNING, JR. - 2518
DOWNING & PECK, P.C.
Attorneys for the Defendants
17 Battery Place, Suite 709
New York, New York 10004

To:  Martin Druyan, Esq.
     Attorney for the Plaintiff
     450 Seventh Avenue, Suite 704
     New York, New York 10123

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
RITA BAYTSAYEVA,                                        **AFFIRMATION**
                                                       **IN SUPPORT**
                    Plaintiff,
                                                       **09-CV-4874**
        -against-

MAKSIM SHAPIRO and SVETLANA ZIS,

                    Defendants.
-------------------------------------X


   JOHN M. DOWNING JR., an attorney duly admitted to practice law before the United States District Court for the Eastern District of New York, hereby affirms the truth of the following statements under penalties of perjury:

   I am a member of Downing & Peck, P.C., attorneys for defendants. I am familiar with this action, having reviewed all the medical records, the plaintiff's deposition transcript, and the defendants' examining physicians' reports and all other records herein.

   I submit this affirmation in support of the within motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that plaintiff did not sustain a "serious injury" pursuant to Section 5102(d) of the Insurance Law of the State of New York in the subject automobile accident.

1

The plaintiff herein, Rita Baytsayeva, claims that there was contact between herself, a pedestrian, and the defendants' vehicle on January 4, 2008 at the intersection of Bath Avenue and 20th Avenue, Brooklyn, New York.

Jurisdiction was obtained in this matter pursuant to 32 U.S.C. 1331 on the grounds that the parties have complete diversity of citizenship and on the grounds that the plaintiff's attorney served a supplemental response setting forth the amount to which the plaintiff claims herself entitled and said amount was over $75,000.00.

Immediately upon receipt of said response, the defendants removed this action to the United States District Court on the grounds of complete diversity of citizenship and amount in controversy over $75,000.00.

The plaintiff commenced the action against the defendants by service of a summons and complaint, copies of which are annexed hereto as Exhibit "A".

The defendants answered the complaint on November 19, 2009 and a copy of defendants' Answer is annexed hereto as Exhibit "B".

The defendants served interrogatories upon the plaintiff requesting, among other things, the claimed injuries and a copy of the said interrogatories are annexed hereto as Exhibit "C".

The plaintiff's Response to Interrogatories, dated December 30, 2009 is annexed hereto as part of Exhibit "D".

As a result of the alleged contact with the motor vehicle, the plaintiff alleges soft tissue injuries of the neck and back and other various and diffuse injuries.

Immediately after the January 4, 2008 accident the plaintiff went to Lutheran Medical Center in Brooklyn, New York.

A copy of the medical record of Lutheran Medical Center is annexed hereto as Exhibit "**E**".

On March 22, 2010 Plaintiff Baytsayeva was deposed. Subsequent to the accident plaintiff changed her name to Andrea Rose and her transcript bears that name. The plaintiff's deposition transcript is annexed hereto as Exhibit "**F**".

On or about May 4, 2010 the plaintiff was examined in an independent medical examination by Jerome M. Block, M.D. neurologist. A copy of Dr. Block's report is annexed hereto as Exhibit "**G**". Dr. Block found no neurological injuries whatsoever.

Defendants requested that the plaintiff's MRI films be examined by a radiologist, David Fisher, M. D.. A copy of Dr. Fisher's report is annexed hereto as Exhibit "**H**". Dr. Fisher found only degenerative conditions in plaintiff's neck and back.

The plaintiff was a student at Long Island University Hospital at the time of the accident and completed a semester of nursing studies after the accident. A copy of her transcript from Long Island University Hospital is annexed hereto as Exhibit "**I**". Plaintiff maintained a B average after the accident.

Copies of photographs of defendants' vehicle after the accident are annexed hereto as Exhibit "J". There was no damage to the vehicle.

Copies of plaintiff's diagnostic film reports from East West Top Medical P.C. and East Manhattan Diagnostic Imaging P.C. are annexed hereto as Exhibit "K". These records establish that plaintiff had no fractures.

Copies of plaintiff's records from Advanced Medical Care are annexed hereto as Exhibit "L". Said records establish that there was no significant limitation or injury following the subject accident of January 4, 2008.

For the reasons set forth herein and all based upon the facts and arguments set forth in the accompanying Memorandum of Law, it is respectfully submitted that the plaintiff has not sustained a "serious injury" under New York Insurance Law §5102(d).

The records also establish that any contact by any vehicle on January 4, 2008 did not proximately cause any significant injury.

WHEREFORE it is respectfully requested that the within motion be granted and that the Court grant summary judgment in favor of defendants herein.

Duly affirmed this 29th
day of December, 2010.

_____
JOHN M. DOWNING JR. - 2518

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
RITA BAYTSAYEVA,

               Plaintiff,

    -against-

MAKSIM SHAPIRO and SVETLANA ZIS,

               Defendants.
------------------------------------X

**MEMORANDUM
OF LAW**

**09-CV-4874**

## PRELIMINARY STATEMENT

The within memorandum of law is submitted in support of the defendants' motion, pursuant to FRCP 56 and New York Insurance Law §5102(d), for an order granting summary judgment in favor of defendant dismissing plaintiff's complaint of the grounds, *inter alia,* that plaintiff did not sustain a "serious injury" under Insurance Law §5102(d).

## STATEMENT OF FACTS

The plaintiff was born Rita Baytsayeva on October 28, 1961 in Vladikauz, Union of Soviet Socialist Republic. Plaintiff'S transcript at Pages 5 and 6. Plaintiff's transcript is annexed to the motion as Exhibit "F".

She was married to Mr. Alan Baytsayeva and divorced from Mr. Baytsayeva in approximately 1996. Exhibit F. Page 11 Line 23.

1

The plaintiff has three children ages 16, 18 and 22. Exhibit F, Page 12.

As of March 22, 2010 plaintiff was 5 foot 4 inches tall and weighed approximately 190 pounds. Exhibit F, Page 4 Line 9.

Plaintiff was a food production technician in the Soviet Union, Exhibit F, Page 16 Line 20.

She attended ASA Institute of Excellence in the United States from 2002 to 2004. Exhibit F Page 17 and received her associate's degree as a medical assistant.

As of the January 4, 2008 accident, the plaintiff was attending Long Island University Hospital to obtain a degree in nursing and had completed 60 credits towards a bachelor's degree. Exhibit F, Page 19.

Plaintiff testified that upon finishing the nursing program at Long Island University she intends to work in the future as a nurse. Exhibit F, Page 20 Line 22.

After the accident plaintiff attended morning and evening courses for one full semester. Exhibit F, Page 22 Lines 8 through 10.

Plaintiff admitted that she had no restrictions on any of her class-work as a result of the alleged injuries after the accident, Exhibit F, Page 23 Line 11 and maintained an approximate 3.0 average, Page 25 Line 19.

When asked if she was bleeding after the accident she

testified, "Not bleeding like bleeding, no.   I wasn't bleeding on the floor or something, no."   Exhibit F,   Page 56 Line 22.

The plaintiff's first doctor, Dr. Miller, who was referred by her attorney, Exhibit F, Page 87 Line 14, asked her what complaints she had approximately one week after the accident. Exhibit F, Page 87 Line 22.

Even though the plaintiff, a trained nurse, made various complaints on said first visit to Dr. Miller of pain in the back, jaw, neck and face, dizziness, and inability to wash dishes, Dr. Miller diagnosed "head trauma, that is all."   Exhibit F, Page 88 Line 17.

Plaintiff admitted that she only began to feel pain in the back a month after the accident.   Exhibit F, Page 88 Line 21.

Plaintiff was taken to Lutheran Medical Center after the accident.   Please see Exhibit E.

The Lutheran Medical Center physician noted under physical exam that the plaintiff's extremities were normal.

Her neurological testing was normal (5 out of 5); her sensory functions were grossly intact and her gait was normal.

The physical exam of the back showed no midline tenderness and no abnormalities.

The physical exam of the neck showed no tenderness, full range of motion and no abnormalities.

The diagnosis was head trauma and occipital hematoma.

3

As of 2:47 p.m. on the day of accident at Lutheran Hospital, the plaintiff was alert, the extremities had full range of motion and there was no dizziness or headache.

At 3:53 p.m. the patient denied any pain at all and she was discharged home.

A CT scan of the cervical spine was taken at Lutheran Hospital and read by Dr. Jen-Fong Shen, radiologist. The finding was no evidence of acute fracture or dislocation, no significant spinal stenosis, normal spinal curvature, and no bony destruction. The impression was no evidence of fracture or dislocation.

Plaintiff also had a CT scan of the brain at Lutheran Medical Center, also read by Dr. Shen, which showed an unremarkable study of the head.

The CT scan of the brain showed no evidence of lesion or hemorrhage, no mucosal thickening. All bony structures were intact.

The plaintiff did not have any physical therapy until appropriately one year after the accident i.e. January 2009. Exhibit F, Page 92 Line 6 and 15.

Plaintiff could not recall the amount of time that she saw the therapist on King's Highway in Brooklyn. Exhibit F, Page 92 Line 22.

The physical therapy that she received at King's Highway consisted of bending and lifting her legs. Exhibit F, Page 93 Line

4

3.

Plaintiff consulted with a Dr. Neystat who was also referred by her attorney. Exhibit F, Page 97 Line 14.

While plaintiff claims that Dr. Neystat prescribed Lexapro for fibromyalgia, Lexapro is used to treat depression and anxiety.

Plaintiff did not see Dr. Neystat until February 2009. Exhibit F, Page 101 Line 19.

The plaintiff admitted that as of March 2010 she was doing rigorous home exercises every day including leaning down and lifting her legs. Exhibit F, Page 102 Line 21.

She also exercised her shoulders, back and legs counting same all the way to "50 times." Exhibit F, page 103.

Plaintiff was employed by Omega Healthcare at the time of the accident. Exhibit F, Page 111.

Plaintiff's elderly patient, Ms. Pildish, with whom plaintiff was walking at the time of the accident, suffered a fractured hip in the subject pedestrian accident and Ms. Pildish was admitted to Sepharolic Nursing and Rehabilitation Center for full time care nursing several months after the accident, thereby ending Ms. Baytsayeva's employment with Ms. Pildish.

Plaintiff went on workers' compensation following the accident. Exhibit F, Page 108.

None of the plaintiff's doctors have ever stated that she cannot work as a home health assistant.

5

Jerome Block, M.D. examined the plaintiff on or about May 4, 2010. Please see Exhibit G.

Dr. Block examined her cranial nerves and found them normal. He examined her sensation and found it normal. He examined her motor system and found that her strength, tone, muscle bulk, gait, balance, and ability to walk on heels and toes and coordination were all normal.

Plaintiff did not report any pain in response to manual muscle testing in any area.

Her deep tendon reflexes were symmetrical and normal.

Plaintiff was able to lie down and raise her legs 90 degrees in the air.

Plaintiff had full and painless motion of the cervical and lumbar ranges of motion.

There was no spasm, trigger points or Tinel's sign over the nerves.

During Dr. Block's examination, Ms. Baytsayeva showed no signs of pain or discomfort. Her movements were easy in sitting, turning, and looking about the room.

There was no pain on palpation of the multiple muscle group.

Her neurological exam was clearly normal in regard to cognition, cranial nerve sensation, motor and reflex systems as well as straight leg raising.

Plaintiff had supple and full ranges of motion throughout the

spinal column.

Dr. Block found no evidence of fibromyalgia and no evidence of dysfunction of the central, peripheral, or autonomic nervous systems.

Dr. Block found no evidence of neurologic dysfunction and found no neurological sequelae or abnormality.

Dr. Block opined that mood disturbance or depression the plaintiff complained of was likely due to two divorces and three adult children whom she had to yell at on occasion.

David A. Fischer, M. D. diplomat of the American Board of Radiology, examined the plaintiff's MRI of the cervical spine and found that the disc dehydration, disc space narrowing, and end plate spurring were evidence of diffuse degenerative changes throughout the cervical spine, not any impact or fall-down accident.

Dr. Fisher found no disc herniations.

### POINT I

**PLAINTIFF HAS NOT SUSTAINED A "SERIOUS INJURY" AS DEFINED BY NEW YORK INSURANCE LAW §5102(d).**

Under New York Law, a plaintiff who seeks recovery for pain and suffering and other non-economic loss arising from an automobile accident must plead and prove a "serious injury." Insurance Law §5104(a).

Section 5102(d) of the New York State Insurance Law provides:

7

Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such persons usual and customary daily activities for not less than 90 days during the 180 days immediately following the occurrence of the injury or impairment.

Plaintiff's testimony and Dr. Block's report establish that plaintiff did not sustain any injury of these categories. There is simply no objective evidence of serious injury from the minor contact to plaintiff's body.

New York's Court of Appeals interpreted the meaning of this requisite "serious injury" in <u>Licari v. Elliot</u>, 57 N.Y.2d 230, 455 N.Y.S.2d 570, 441 N.E.2d 1088 (1982).

By affirming the unanimous opinion of the Appellate Division, Second Department, the Court of Appeals mandated that the lower courts must "first determine whether or not a *prima facie* case of serious injury has been established which would permit a plaintiff to maintain a common law cause of action in tort." <u>Licari</u> at 237.

The Court of Appeals stated that the determination of whether a plaintiff has a cause of action to assert is a threshold question for the Court as the Legislature enacted the statute to modify the

rights of persons to sue for personal injuries.  Id. at 237-238.

As the Court held:

> It is incumbent upon the Court to decide in
> the first instance whether plaintiff has a
> cause of action to assert within the meaning
> of the statute ... Thus, we believe that the
> Legislature intended the Court should decide
> the threshold question of whether the evidence
> would warrant a jury finding that the injury
> falls within the class of injuries that, under
> no-fault, should be excluded from judicial
> remedy.  If it can be said, that as a matter
> of law, that plaintiff has suffered no serious
> injury ... then plaintiff has no claim to
> assert and there is nothing for the jury to
> decide.  Id. at 237-238.

Indeed, the Court of Appeals recognizes that one of the
obvious goals of the legislative scheme of no-fault automobile
reparation is to keep minor personal injury cases out of the Court.
Id. at 236.

The term, "significant" as it appears in the statute has
been defined as "something more than a minor limitation of use" and
the term "substantially all" has been construed to mean "that the
person has been curtailed from performing his usual activities to
a great extent rather than some slight curtailment." Licari v.
Elliott, 57 N.Y.2d 230, 455 N.Y.S.2d 570, 441 N.E.2d 1088 (1982).

It is well settled under New York Law that allegations of
subjective complaints of occasional pain or recurring pain fail to
satisfy the statutory threshold showing of a serious injury. Shaw
v. Looking Glass Assoc., 8 A.D.3d 100, 779 N.Y.S.2d 7 (1st Dept

9

2004).

Plaintiff offers nothing more than subjective complaints.

Plaintiff's unimpaired nursing study for one semester and continuation of daily activities demonstrate that plaintiff's normal and customary activities were not affected by the extremely minor accident.

The term "consequential" [injury] means important or significant. Kordana v. Pomellito, 121 A.D.2d 783, 503 N.Y.S.2d 198 (3rd Dept 1986).

Accordingly, plaintiff has not sustained a "serious injury" pursuant to the New York Insurance Law, and the plaintiff's complaint should be dismissed in its entirety.

## POINT II

**ANY CONTACT WITH THE GROUND DID NOT CAUSE ANY SERIOUS INJURY TO MS. BAYTSAYEVA.**

The photographs establish no significant contact to the vehicle.

The plaintiff testified that there was no bleeding as a result of the impact.

The hospital doctors diagnosed no "head trauma" injuries to the head, neck or back.

Plaintiff was released from the emergency room the same day.

Plaintiff returned to work the next day and continued to study for the following semester at Long Island University.  As of her deposition, she had no current medical treatment or prescriptions.

Plaintiff must establish a causal relationship between her alleged injury and the subject occurrence.  <u>Pommells v. Perez</u>, 4 N.Y.3d 566, 830 N.E.2d 278, 797 N.Y.S.2d 380 (2005); <u>Figueroa v. Castillo</u>, N.Y. Slip Op. 08669 (1st Dept 2006) <u>Style v. Joseph</u>, 32 A.D.3d 212, 820 N.Y.S.2d 26 (1st Dept 2006).

Where plaintiff fails to establish that the claimed injuries were proximately caused in the accident, summary judgment should be granted to defendant.   <u>Pommello v. Perez</u>, 4 N.Y. 3d 566, 830 N.E. 2d 278, 797, N.Y.S2d 380 (2005).

<u>**POINT III**</u>

**THE PLAINTIFF DID NOT SUSTAIN ANY SIGNIFICANT INJURY TO THE HEAD NECK OR BACK.**

The triage initial assessment form of Lutheran Medical Center establishes no neurological or orthopedic injury.

There was no diagnosis of any neck or back injury at Lutheran Medical Center.

An x-ray of the left and right tempero-mandibular joint on January 28, 2008 showed no fracture.

MRI of the cervical spine of April 2, 2008 showed no evidence of a nerve root or spinal chord impingement.

Indeed, there are no objective tests showing any serious

11

injury of the neck or back herein.

The Court of Appeals in the case of <u>Gaddy v. Eyler</u>, 79 N.Y.2d 955, 583, N.Y.S.2d 186, 592 N.E.2d 794 (1992) dismissed the plaintiff's complaint on the grounds of lack of serious injury. The court noted that the plaintiff had a normal neurological examination. The court stated that the burden thus shifted to the plaintiff to come forward with sufficient evidence to overcome defendant's motion by demonstrating that she sustained a serious injury.

There must be objective medical evidence of alleged serious injury, not simply subjective complaints. <u>Toure v. Avis Rent A Car System</u>,98 N.Y.2d 345, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (2002), <u>Haddadnia v. Saville</u>, 29 A.D.3d 1211, 815 N.Y.S.2d 319 (3rd Dept. 2006). Here, there is no such objective evidence of serious injury.

<u>**CONCLUSION**</u>

For the forgoing reasons, plaintiff's complaint should be dismissed in its entirety.

Respectfully submitted,

DOWNING & PECK, P.C.
Attorneys for Defendant
17 Battery Place - Suite 709
New York, New York 10007
212-514-9190
File #: 3.1107

BY: _____
JOHN M. DOWNING, JR. - 2518

12

JDJ:JM
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
RITA BAYTSAYEVA,                                     **LOCAL 3(g)**
                              Plaintiff,             **STATEMENT**


        -against-                                    **09-CV-4874**

MAKSIM SHAPIRO, SVETLANA ZIS,

                              Defendants.
--------------------------------------X


        Defendants by their attorney, Downing & Peck, P. C. hereby

submits the following statement under the Rule 3 (g).

        1.    On January 4, 2008 Svetlana Zis was operating a 2007

Honda, License Plate No. WAV62B, New Jersey with the knowledge and

consent of its owner.

        2.    On January 4, 2008 Svetlana Zis was operating a 2007

Honda at or near the intersection of Bath Avenue and Bay 25th

Street, Brooklyn, New York.

Dated: New York, NY

        December 29, 2010

                              Yours etc.


                              DOWNING & PECK P.C.
                              Attorneys for the Defendants
                              17 Battery Place
                              New York, New York 10004
                              (212) 514-9190

EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------X

RITA BAYTSAYEVA

Index No. 26592-    2009
Date Purchased: Oct. 21, 2009

Plaintiff,

-against-

Plaintiff(s) designate(s)
KINGS
County as the place of trial.

MAKSIM SHAPIRO,
SVETLANA ZIS
HONDA LEASE TRUST
HONDS CORPORATION ,

Defendants.

The basis of venue is
Place of Accident

-------------------------------------------------------------X

*Summons*
WITH NOTICE

To the above named Defendant(s)

*You are hereby summoned* to answer the complaint in this action and to serve a copy
of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance,
on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day
of service (or within 30 days after the service is complete if this summons is not personally delivered
to you within the State of New York); and in case of your failure to appear or answer, judgment will
be taken against you by default for the relief demanded in the complaint.

Dated: August 24, 2009

Attorney for Plaintiff
Martin D. Buyan, Esq.
Office and Post Office Address
450 7th Avenue Suite 3302
New York, NY 10123 .

Defendant's address:

NOTICE The nature of this action is a lawsuit seeking damages in the amount of one million
dollars. The relief sought is money damages in the amount of one million dollars plus interests costs
based upon Defendants negligence in the operation of their motor vehicle that struck the pedestrian
Plaintiff resulting in her physical injuries, requiring medical treatment, and other resultant damages.
Upon your failure to appear, judgment will be taken against you by default for the sum of One
Million Dollars with interests from August 24, 2009   and the costs and disbursements of this action.


RECEIVED

OCT 27 2009

NJM INS. CO.
A.C. PIP

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

------------------------------------------------------------------X

    RITA BAYTSAYEVA

                      Plaintiff,         **AMENDED**
                                             **VERIFIED**
       -against-                   **COMPLAINT**

    MAKSIM SHAPIRO,
    SVETLANA ZIS
    HONDA LEASE TRUST
    HONDS CORPORATION ,

                        Defendants.

------------------------------------------------------------------X

    Rita Baytsayeva by her attorneys Martin Druyan and Associates as and for her verified complaint alleges against the Defendants

1. At all times hereinafter alleged on  Jan. 4, 2008 in Kings County,  New York State, at about Bath Ave and 23rd St. in the 62nd Police Precinct.

2. Rita Baystayeva was a resident of New York City

3. Rita Baystayeva was a pedestrian in Kings County

4. Maksim Shapiro owned a motor vehicle.

5. Maksim Shaprio rented or leased  a motor vehicle

6. Maksim Shapiro operated a motor vehicle.

7. Svetlana Zis owned a motor vehicle

8. Svetlana Zis rented or leased a motor vehicle.

9. Svetlana Zis  operated a motor vehicle

9A. The allegations and actions served in the previous complaint against Honda Lease Trust(Honda hereafter) and Honds corporation be and are discontinued by stipulation between the parties.

10. Defendants herein alone and together operated a motor vehicle in Kings County on   Jan. 4, 2008.

11. Defendants vehicle struck the plaintiff in Kings County on said date.

12. Plaintiff was a pedestrian at the time and place she was struck by the Defendants motor vehicle.

13. Plaintiff was working at the time and place that she was struck by the Defendants vehicle

14. Defendants were negligent in the operation of their motor vehicle in Kings County at about the aforementioned location , when they were speeding, failed to look, watch for pedestrians as Plaintiff, ignored traffic conditions, failed to apply brakes, were careless, not paying attention to traffic conditions, violated the NYC Administrative Code and NY State Vehicle and Traffic Law, drove recklessly in violation of speed and traffic laws rules and regulations, didn't signal or brake, or slow, ignored traffic conditions, were inattentive, didn't  sound horn, turn away and did not take steps to avoid striking Plaintiff pedestrian, that the defendants alone and together were generally negligent and reckless, and failed to take steps to avoid the accident in the operation of their motor vehicle. .

15. Plaintiff was not negligent in any way when struck by Defendants vehicle.

16. As the result the Plaintiff has been rendered sick sore lame and disabled, has missed work, and suffered physical and mental damages, constant pain, has incurred medical expenses, hospitalization, doctors treatment, medicines, up to date and continuing, and has lost the

enjoyment of life, is not able to take care of her personal needs, has had to file for workers compensation benefits, has not worked since the day of the accident, suffered injuries including but not limited to "marked exaggeration of the lumbar lordosis, L1-L2 disc herniation..deforms the ventral thecal sac, L-4_l5 right foraminal disc herniation, with right encroachment, ....the exacerbation of any medical, physical or psychiatric conditions that were in remission or non symptomatic prior to the plaintiff 's accident with defendant vehicle described herein, Plaintiff further suffered exacerbation of depressive disorder secondary to traumatic brain injury and chronic physical disability and related disorders Axis II, II, ....

17. Plaintiff has been examined and treated by numerous physicians and health care professional incurring medical bills and expenses, travel costs, and other special damages, which are continuing to date.

18. Plaintiff suffered the exacerbation of her prior physical condition.

19. Plaintiffs injury is permanent

20. Plaintiff sustained a "serious injury" as defined by the Insurance Law of the State of New York, as amended sects.5102d, 5104a, permanent disc injuries and psychiatric injuries and other injuries described supra, "permanent loss ..of a body organ function or system, permanent consequential limitation of use of a body organ or member, significant limitation of a body function or system...also the medically determined injury or impairment of a non permanent nature which prevents the plaintiff from performing substantially all of the material acts which constitute the plaintiffs usual .. daily activities...not less than 90 days during 180 days ..following the occurrence...."

Wherefore Plaintiff demands judgment against the defendants in the amount of one million

dollars plus the costs and disbursements of this action with statutory interest, for all lawful damages.

Dated:  New York, N.Y.

Jan 26, 2010

MARTIN BRUYAN ESQ AND
ASSOCIATES
Attorneys For Plaintiff
450 7th Ave
New York, N.Y. 10123
212-279-5577

summ

**EXHIBIT B**

MDP/de
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X     ECF CASE
RITA BAYTSAYEVA,

               **AMENDED**
           Plaintiff,         **VERIFIED ANSWER**

    -against-                 **09-CV-4874**

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION,    **DEFENDANTS DEMAND**
                                        **TRIAL BY JURY**

               Defendants.      **J. Orenstein**
---------------------------------------X

      Defendants MAKSIM SHAPIRO, SVETLANA ZIS, HONDA LEASE TRUST, and HONDA CORPORATION, by their attorneys, Downing & Peck, P.C., hereby answers the amended verified complaint with dated May 13, 2010 as follows:

1.     Denies knowledge and information sufficient to form a belief as to each and every allegation contained in paragraphs 1, 2, 3, and 12 of said complaint.

2.     Admits each and every allegation contained in paragraphs 4, 5, 9, and 9A of said complaint.

3.     Deny each and every allegation contained in paragraphs 6, 13, 14, 15, 16, 17, 18, and 19 of said complaint.

4.     Upon information and belief denies each and every allegation contained in paragraphs 7, 8, 9C, 10 and 11 of said complaint.

               **AS AND FOR A FIRST AFFIRMATIVE DEFENSE**

5.     Plaintiff has not sustained a serious injury as defined by the New York State Insurance Law §5102 and, therefore, is barred from recovery herein.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

6.    The plaintiff's damages must be reduced in accordance with the comparative negligence of plaintiff.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

7.    Plaintiff's damages, if any, must be reduced in accordance with their failure to mitigate damages.

Dated:    New York, New York
          May 17, 2010

                              Yours Etc.,

                              _____
                              MARGUERITE D. PECK - 3627
                              Downing & Peck, P.c.
                              Attorney for Defendants
                              5 Hanover Square - 20th Fl.
                              New York, New York 10004
                              212-514-9190

To:    Martin Druyan, Esq.
       Attorney for Plaintiff
       450 7th Avenue - Suite 704
       New York, New York 10123
       212-279-5577

**<u>VERIFICATION</u>**

STATE OF NEW YORK. )

COUNTY OF NEW YORK .)    ss.:

I, the undersigned, an attorney duly admitted to practice in the courts of New York State, state that I am MARGUERITE D. PECK, the attorney of record for defendants, in the within action; I have read the foregoing AMENDED VERIFIED ANSWER and know the contents thereof; the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters I believe it to be true. The reason this verification is made by me and not by said defendants is because said defendants are not presently in the County of New York wherein I maintain my office.

The grounds for my belief as to all matters not stated upon my own knowledge are as follows: Investigations, reports, etc.

Dated:   New York, New York
         May 17, 2010

_____
MARGUERITE D. PECK - 3627

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK   )

COUNTY OF NEW YORK   ) ss.:

**Dominick Eastham**, being duly sworn, deposes and says:  I am not a party of this action, I am over 18 years of age, and I reside in Staten Island, New York.

That on May 17, 2010, I served the within **AMENDED VERIFIED ANSWER** by mailing a copy to each of the following persons at the last known address set forth after each name below:

To:  Martin Druyan, Esq.
     Attorney for Plaintiff
     450 7th Avenue - Suite 704
     New York, New York 10123
     212-279-5577

                                        _____
                                        DOMINICK EASTHAM


STATE OF NEW YORK          )
COUNTY OF NEW YORK   )  ss.:


     On the 17TH day of May in the year 2010 before me, the undersigned, a Notary Public in and for said State, personally appeared **DOMINICK EASTHAM** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                        _____
                                        NOTARY PUBLIC

Robert M. Mazzei
Notary Public, State of New York
No. # 02MA6201061
Qualified in Nassau County
Commission Expires in 02/17/20 /3

# Answers to Complaints
1:09-cv-04874-RJD -JO Baytsayeva v. Shapiro et al

### U.S. District Court

### Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered by Metzler, Alison on 5/17/2010 at 4:52 PM EDT and filed on 5/17/2010

| | |
|---|---|
| **Case Name:** | Baytsayeva v. Shapiro et al |
| **Case Number:** | 1:09-cv-04874-RJD -JO |
| **Filer:** | Honda Lease Trust |
| | Svetlana Zis |
| | Maksim Shapiro |
| | Honda Corporation |

**Document Number:** 17

## Docket Text:
*Amended Verified* **ANSWER to Complaint by Honda Corporation, Honda Lease Trust, Maksim Shapiro, Svetlana Zis. (Metzler, Alison)**

**1:09-cv-04874-RJD -JO Notice has been electronically mailed to:**

John M. Downing      downingjr@aol.com

Marguerite D. Peck      margueritepeck@mindspring.com

Martin Druyan      mdruyanesq@aol.com

**1:09-cv-04874-RJD -JO Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=5/17/2010] [FileNumber=5220543-0]
[583151cc360addaa597d6d7c7242d8f153238f59c44fb7a08ddb0ff8f7ff661efdc0a
9b1703daf850115f6e4fac94e3e5c5d935117d0906ee7c68ca95cfdf7a8]]

09-CV-4874

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------
RITA BAYTSAYEVA,

                                    Plaintiffs,

                  -against-

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION

                                    Defendants,
--------------------------------------------------

## AMENDED VERIFIED ANSWER

**DOWNING & PECK, P.C.**
*Attorneys for Defendants*
*Office and Post Office Address, Telephone*
**5 Hanover Square - 20th Floor**
**New York, New York  10004**
**212-514-9190**

**EXHIBIT C**

JDJ/mh
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
RITA BAYTSAYEVA,

                    Plaintiff,                    **INTERROGATORIES**

        -against-                                 **09-CV-4874**

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION,

                    Defendants.
------------------------------------X


     PLEASE TAKE NOTICE, that the defendants, MAKSIM SHAPIRO,

SVETLANA ZIS, HONDA LEASE TRUST, HONDA CORPORATION pursuant to Rule

33 of the Federal Rules of Civil Procedure, hereby requests the

plaintiff, to answer under oath the following interrogatories in

writing, within thirty days:

    1.   State how it is claimed the accident occurred.

    2.   State all the acts and/or omissions constituting the
         negligence claimed.

    3.   State the nature and extent of all injuries.

    4.   Specify those injuries claimed to be permanent.

    5.   Accurately state length of time confined to bed.

    6.   Accurately state length of time confined to home.

    7.   State name of each and every hospital, clinic or doctor's
         office where any treatment or examination was rendered,
         and length of time, if any, confined there and the number
         and dates of visits.

    8.   State name and address of employers from the time of the
         alleged accident to the present.

    9.   State length of time incapacitated from employment due to
         the accident.

    10.  If self-employed, state nature of self-employment and
         business address at the time of the accident and at
         present.

11. If a student at the time of the accident, set forth name and address of all schools attended from the date of the accident to date and state the length of time incapacitated from attending school due to the accident.

12. State total amounts claimed as special damages for:

    (a) physicians' expenses;
    (b) medical expenses;
    (c) nurses' expenses;
    (d) hospital expenses;
    (e) lost earnings; and
    (f) any other expenses which it is claimed resulted from this accident.

13. State the residence address of the plaintiff at the time of the accident and at present; and state the date of birth of the plaintiff.

PLEASE TAKE FURTHER NOTICE, that in the event of the plaintiff's failure to answer these interrogatories within thirty (30) days, the defendants will move to preclude the offering of any evidence as to the matters herein demanded and to dismiss the Complaint.

Dated:    New York, New York
          November 19, 2009

                                Yours Etc.,

                                John M. Downing, Jr.-2518
                                Downing & Peck, P.c.
                                Attorney for Defendants
                                5 Hanover Square - 20th Fl.
                                New York, New York 10004
                                212-514-9190

To: Martin Druyan, Esq.
    Attorney for Plaintiff
    450 7th Avenue - Suite 3302
    New York, New York 10123
    212-279-5577

JDJ/mh
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
RITA BAYTSAYEVA,

                Plaintiff,

   -against-

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION,

                Defendants.
-------------------------------------X

**EXPERT
INTERROGATORIES**

**09-CV-4874**

    Defendants, MAKSIM SHAPIRO, SVETLANA ZIS, HONDA LEASE TRUST,

HONDA CORPORATION by their attorneys, DOWNING & PECK, P.C., demands

pursuant to Rule 26 of the Federal Rules of Civil Procedure that

plaintiff respond to the following interrogatories at the office of

the undersigned within thirty days form the date hereof:

1.    Identify each person upon whom the plaintiff will rely as an
    expert witness at the time of trial.

2.    Set forth in reasonable detail the subject matter on which
    each expert is expected to testify.

3.    Set forth the substance of the facts and opinions on which
    each expert is expected to testify.

4.    Set forth the qualifications of each expert witness.

5.    Set forth a summary of the grounds for each opinion.

Dated:   New York, New York
         November 19, 2009

                    Yours Etc.,

                    _____
                    John M. Downing, Jr.-2518
                    Downing & Peck, P.c.
                    Attorney for Defendants
                    5 Hanover Square - 20th Fl.
                    New York, New York 10004
                    212-514-9190

To: Martin Druyan, Esq.
     Attorney for Plaintiff
     450 7th Avenue – Suite 3302
     New York, New York 10123
     212-279-5577

JDJ/mh
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
RITA BAYTSAYEVA,
Plaintiff,

-against-

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION,

Defendants.
--------------------------------------X

**NOTICE TO PRODUCE**

**09-CV-4874**

Defendants, MAKSIM SHAPIRO, SVETLANA ZIS, HONDA LEASE TRUST, HONDA CORPORATION, by their attorneys, DOWNING & PECK, P.C., demands pursuant to Rule 34 of the Federal Rules of Civil Procedure, that the plaintiff provide the following items for discovery and inspection within thirty days from the date hereof at the office of the undersigned:

1. Duly executed and acknowledged authorizations allowing the undersigned to obtain the following:
   a) The plaintiff's employment records for 2005, 2006, 2007 and 2008 from all employers who employed the plaintiff.
   b) Records from all hospitals, doctors, therapists and medical providers who treated, examined or conducted tests on the plaintiff for the injuries allegedly sustained by the plaintiff arising from the accident of January 4, 2008.
   c) Records of all hospital, doctors, therapists and medical providers who treated, examined or conducted tests upon the plaintiff prior to January 4, 2008 for injuries or conditions similar to the injuries allegedly sustained on January 4, 2008.

d) If a Workers' Compensation claim was made, copies of the Workers' Compensation file from the carrier and the Workers' Compensation Board. The authorization must have the file number.

e) The records of all collateral sources who have replaced or indemnified, in whole or in part, the plaintiff for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earnings, or other economic loss claimed by the plaintiff.

f) The record of all pharmacies which filled plaintiff's prescriptions regarding the injuries allegedly sustained on January 4, 2008.

g) School records of all schools and colleges in which the plaintiff has been enrolled since January 4, 2008.

2. Copies of all photographs taken which depict the scene of the accident of January 4, 2008.

3. All photographs taken which depict the injuries allegedly sustained by the plaintiff resulting from the accident of January 4, 2008.

4. Set forth the names and addresses of each witness to the accident of January 4, 2008.

5. If the plaintiff is in possession of any statement of defendant provide a copy of same.

6. Identify each person whom the plaintiff expects to call as an expert witness at trial and disclose in reasonable detail the subject matter on which each expert is expected to testify, the substance of the facts and opinions on which each expert

is expected to testify, the qualifications of each expert and a summary of the grounds for each expert's opinion.

7. All photographs of the vehicles involved in the accident of January 4, 2008 which depict damage sustained in the accident.

Dated:     New York, New York
           November 19, 2009

                                    Yours Etc.,


                                    John M. Downing, Jr.-2518
                                    Downing & Peck, P.c.
                                    Attorney for Defendants
                                    5 Hanover Square - 20th Fl.
                                    New York, New York 10004
                                    212-514-9190

To:   Martin Druyan, Esq.
      Attorney for Plaintiff
      450 7th Avenue - Suite 3302
      New York, New York 10123
      212-279-5577

JDJ/mh
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
RITA BAYTSAYEVA,

             Plaintiff,

    -against-

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION,

             Defendants.
-------------------------------------X

**NOTICE TO TAKE
DEPOSITION UPON ORAL
EXAMINATION**

**09-CV-4874**

S I R S :

PLEASE TAKE NOTICE, that pursuant to Rule 30 of the Federal
Rule of Civil Procedure, the testimony upon oral examination of the
plaintiff, RITA BAYTSAYEVA, will be taken before a Notary Public,
who is not an attorney, or employee of an attorney, for any party
or prospective party herein and who is not a person who would be
disqualified to act as a juror because of interest in the event or
because of consanguinity of affinity to any party herein:

      DATE:       December 16, 2009 at 2:00 p.m.

      PLACE:      DOWNING & PECK, P.C.
                    5 Hanover Square - 20th Floor
                    New York, New York 10004

PLEASE TAKE FURTHER NOTICE, that each party then and there to
be examined is required to produce photographs of vehicles involved
in the accident of January 4, 2008 which show damages sustained in
accident; all photographs which show injuries sustained by each
plaintiff in the accident of January 4, 2008; all photographs of
scene of the accident; and income tax records for each plaintiff
for 2002, 2003 and 2004 so that such documents can be marked as

exhibits and used on the examination.

Dated:     New York, New York
           November 19, 2009

                                    Yours Etc.,

                                    _____
                                    John M. Downing, Jr.-2518
                                    Downing & Peck, P.c.
                                    Attorney for Defendants
                                    5 Hanover Square - 20th Fl.
                                    New York, New York 10004
                                    212-514-9190

To:   Martin Druyan, Esq.
      Attorney for Plaintiff
      450 7th Avenue - Suite 3302
      New York, New York 10123
      212-279-5577

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )

COUNTY OF NEW YORK  ) ss.:

**Meghan Hood**, being duly sworn, deposes and says:  I am not a party of this action, I am over 18 years of age, and I reside in Staten Island, New York.

That on November 20, 2009, I served the within **INTERROGATORIES, EXPERT INTERROGATORIES, NOTICE TO PRODUCE, and NOTICE TO TAKE DEPOSITION UPON ORAL EXAMINATION** by mailing a copy to each of the following persons at the last known address set forth after each name below:

To:  Martin Druyan, Esq.
     Attorney for Plaintiff
     450 7th Avenue - Suite 3302
     New York, New York 10123
     212-279-5577

_____
MEGHAN HOOD

STATE OF NEW YORK        )
COUNTY OF NEW YORK  ) ss.:

On the 20th day of November in the year 2009 before me, the undersigned, a Notary Public in and for said State, personally appeared **MEGHAN HOOD** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

Robert M. Mazzei
Notary Public, State of New York
No. # 02MA6201061
Qualified in Nassau County
Commision Expires in 02/17/20 13

09-CV-4874

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
RITA BAYTSAYEVA,

                    Plaintiffs,

        -against-

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION,

                    Defendants,

------------------------------------------X


**INTERROGATORIES,
EXPERT INTERROGATORIES;
NOTICE TO PRODUCE, and
NOTICE TO TAKE DEPOSITION UPON ORAL EXAMINATION**


**DOWNING & PECK, P.C.**
*Attorneys for Defendants*
*Office and Post Office Address, Telephone*
**5 Hanover Square - 20th Floor
New York, New York  10004
212-514-9190**

**EXHIBIT D**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————X

RITA BAYTSAYEVA,

                    Plaintiff,

     -against-

MAKSIM SHAPIRO, SVETLANA ZIS,
HONDA LEASE TRUST, HONDA CORPORATION,

                 Defendants.
————————————————————————X

RESPONSE TO
INTERROGATORIES

09-CV-4874

1. The accident occurred: Plaintiff/pedestrian was crossing the street and was struck by defendants operating their motor vehicle. Plaintiff injured her head, low back, shoulders, (see below) whole body.

2. The acts and/or omissions constituting the negligence claimed: Defendants operated the motor vehicle carelessly, were speeding, did not slow, not looking or watching, failed to apply brakes or turn away or to sound horn to slow; were reckless in violation of NYS Vehicle and Traffic Law and NYC Administrative Code as described herein, failed to take steps to avoid the accident, ignored rules of the road and traffic conditions, did not look or see plaintiff and other pedestrians crossing the street, were not paying attention, were generally negligent and failed to take steps to avoid striking plaintiff pedestrian with their auto, and to avoid the accident herein, were speeding, reckless, ignored the traffic signs, speed limitations, didn't sound horn, apply brakes or slow down, or use steering wheel to turn away vehicle.

3. The nature and extent of all permanent injuries: Plaintiff suffered back (disc), head, neurological, whole body, disabling, permanent injuries.

She cannot enjoy life or attend to her and her family daily functions, she cannot attend Broadway shows, cannot cook, eats substandard frozen food , can't clean her apartment, can t bake desserts, can't sleep peacefully, has insomnia, is forgetful, must repeat simple tasks, has eyesight impairment, cognitive function is impaired.,

Plaintiff suffered a concussion, permanent neurological damages that renders her disabled and unable to work, from the accident to date, and continuing, suffering dizziness, headaches, inability to concentrate, think clearly or cogently, loss of short term and long term memory, is depressed regarding the injuries and consequences described herein,

Plaintiff cannot work has filed for workers comp. and social security disability, applications pending.

MRI INDICATES BRAIN 2/09 ;

Cervical strain with exacerbation of any preexisiting degenerative changes

Low back strain with MRI evidence of a herniated disc to the left at L1-L2 with mild stenosis,

MRI INDICATES BRAIN 2/09 NON SPECIFIC WHITE MATTER CHANGES.

She suffers muscle spasms, tenderness, taut bands, osteopathis somatic dysfunctions in the cervical spine, there are not appreciated in the thoracic spine and lumbar spine. (Dr. Perry )

Right leg pain. Pain is at the level of 7-8/10 with radiation to the right foot. Symptoms described as burning, sharp and moderate. The present condition is associated with back stiffness. The following factors improved partially. Pain is at the level of 6-7/10. Patient reports partial improvement with physical therapy. Intermittent vertigo has remained unchanged. She continues c/o memory loss, confusion, inability to sleep. She continues having episodes of confusion and disorientation. Anxious and headaches treated. Past medical history is unremarkable.

There is exacerbation of any pre-existing asymptomatic condition. Lexapro – imported – 5 mg tablet (one PO HS) (active); usage stated on 1/19/2009 and usage stopped on 1/19/2009 medication was prescribed by Neystat, Marina MD.

Plaintiff suffers fibromyologia pain in her hand.,

Currently unemployed due to accident disability, receiving workers compensation, this is a permanent injury that impairs all physical functions of plaintiff.

Review of Plaintiff system: Psychiatric: Depression, Neurological: numbness in hands, tingling in hands, weakness, headache, Musculoskeletal: arm pain, Eyes: blurred vision, Ears: ringing in ears, Constitutional Symptoms: sleep problems, night sweats, weight gain, Cardiovascular: chest pain.
Neurological Exam: Mental Status: Plaintiff mood is anxious and depressed. Reflexes: tight Achilles reflex is ¼. Babinski reflex is absent. Sensation: Touch, pin, vibratory and proprioception sensations are decreased in the lateral aspect of the right leg.
Physical therapy follow up: Radiculipathy – Cervical (723.4) (Brachial neuritis or radiculitis) and Tadiculopathy (724.4) - Lumbar/Thoracic. Subjective: the patient complains of persistent pain, 5-6/10. Decrease of pain for few hours after treatment. Objective: Tenderness neck extensors, suboccipital area, physical therapy treatment includes the following: supervised electrical stimulation applied for 20 min using: TENS mode, hot packs, time 20 minutes. Mysfascial releases. Neuromuscular reeducation performed that consists of posture awareness. Therapeutic exercises performed to improve strength and flexibility x 30 minutes. Cervical exercise include: ROM exercise flexion, extension, side flexion, rotation and shoulder shrugs (reps-12, sets- 2, holding time- 2 seconds). Low back stretching using bilateral knee to the chest (reps – 12, sets – 1) and pelvis tilt (reps – 12, sets – 2). Applied ultrasound (time – 5 min, intensity – 1.5 W/cm.sq).

These medical conditions were caused by: MV Accident.

Continued 3 Injuries:

Present pain with: decreased activities of daily living, ambulation, endurance, functional status and mobility, difficulty with standing, self-care activities, transfers and work activities and joint stiffness. The symptoms are described as; disabling, intermittent, radiating and throbbing. The following factors aggravate symptoms: activities of daily living, carrying objects, standing, trunk movements and walking. Vital signs: BP sitting. Level of mobility: able to ambulate without assistive device.

4. Injuries claimed to be permanent: All injuries herein are deemed permanent.

5. Length of time confined to bed 1/4/08 DATE ACCIDENT, TO Feb. 4, '08 completely due to concussion herein, and injuries, and occasionally thereafter to date and continuing.

6. Length of time confined to home 1/4/08 date of accident to Feb. 4, '08, and continuing to date, on occasion due to injuries herein, attempted to work : Vocational Services, 8/09 unsuccessfully Bd of Ed Training Program and Omega Health Services Bklyn NY, could not due to injuries;

Feb. '08 left house and bed to obtain therapy and medical treatment,

7. Each and every hospital, clinic or doctor's office where any treatment or examination was rendered, and length of time, if any confined there and the number and dates of visits. Plaintiff visited doctors:

Dr. Kuhn – Neurologist – 200 W. 57th St., Ste# 1205, New York, NY 10019
Dr. Jean Miller - 4738 Broadway, New York, NY 10040
Marina Neystat, MD - 1725 E. 12th St., Ste# 501, Brooklyn, NY 11229
East Manhattan Diagnostic Imaging, P.C., 424 E 89th St., New York, NY 10028
Slava Nestsor, M.S.P.T. - 1725 E. 12th St., Ste# 501, New York, NY 11229
Dr. Marc. M. Levinson – 19 Beekman St., New York, NY 10038 Seaport
Lutheran Med Center (ER) Bklyn NY

8. Name and address of employers from the time of the alleged accident to the present:

No Employment: cannot work – 2009 NYU evaluation Vocational Training

2009        Omega Home Health Care 44 Court St. Brooklyn, NY 11201

9. Time incapacitated from employment due to the accident. 1/4/08 to date and continuing

        I.      2009 Attempted to work at NYC Dept. of Ed, Vocational training,

        II.     Omega Health Care 2009 – Plaintiff failed at both, couldn't work – pain back, head, body, etc. See herein.

10. N/A

11. N/A

12. Total amounts claimed as special damages for:

    (a) physicians' expenses; Not paid by Plaintiff out of pocket, Workers Comp to pay
    (b) medical expenses; Workers Comp to pay doctors therapy & medicine, and nurse, if any
    (c) Lutheran Medical Center, 150 55th St., Brooklyn, NY 11220hospital expenses;
    (d) lost earnings; $32,000 about 2 years plus continuing to date.
    (e) any other expenses which it is claimed resulted from this accident: Medicine, see attached unpaid about $900; plus car service, train to doctors, physical therapy - $1,000 estimated, and continuing.

13. The residence address of the plaintiff at the time of the accident and at present: 40 West 115th Street, New York, NY 10021.

    The date of birth of the plaintiff: Oct. 28, 1961

Dated: New York, New York             Martin Druvan & Associates -6866
      Dec. 30, 2009                Attorney for Plaintiff
                                     450 Seventh Avenue, Suite 704
                                     New York, NY 10123

To : Downing and Peck, Attorneys for Defendant

**EXHIBIT E**

## Invoice Summary
### Lutheran Medical Center

DOWNING & PECK, P.C.
5 HANOVER SQUARE
20TH FLOOR
NEW YORK, NY 10004

Request Date: 03/30/2010
Invoice Date: 04/06/2010    Invoice # :    de0000052553

-----------------------------------------------------------------------

For copying records on:    **BAYSAVEVA, RITA**
Request ID #:              de0000052553

Number of pages copied:   9

Sales Tax applied this invoice:  0.00

**Total Charges:  6.75**

Payments Received:  6.75
Adjustments/Credits:  0.00
**Balance Due:  0.00**

Please Return Lower Portion with Payment to:

-----------------------------------------------------------------------

Lutheran Medical Center
150-55th Street
Brooklyn, NY 11220

Requester:    DOWNING & PECK, P.C.
**Patient:    BAYSAVEVA, RITA**
Invoice # :   de0000052553
Invoice Date:  04/06/2010

**Balance Due:  0.00**  Amount Paid: _____

# Patient Fact Sheet

## Name and Address

BAYSAVEVA, RITA

40 WEST 159 STREET

NEW YORK         NY  10026

**Phone:**  (212)828-2188   **Sex:**    F

**SS No:**   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   **Marital Status**  S

**Race:**   1        **Religion**

**BirthDate**  10/28/1961   **Occupation:**

**Patient's Maiden Name:**

### Employer

34 COURT STREET

**Phone:**

## Nearest Relative

BAYSAVEVA, MARIANNA

**Home Phone:**  (347)784-4196   **Rel:**  D

**Business Phone:**

## Admission Data

| Account Number | Unit Number |
|---|---|
| 0800401218 | 0001189969 |

| Admit Date | Admit Time | ER MD |
|---|---|---|
| 1/4/2008 | 14:03 | 99 NO, PM |

| Triage Time | Prim Care MD |
|---|---|
| | 9999 NO, PMD |

## Guarantor

BAYSAVEVA, RITA

40 WEST 159 STREET

NEW YORK     NY  10026

**Home Phone**     (212)828-2188

**Business Phone**

**Rel:**        S   **SS:**   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

**Occ:**

**Employer**

## Emergency Contact

BAYSAVEVA, MARIANNA

**Home Phone:**  (347)784-4196   **Rel:**  D

**Business Phone:**

## Insurance Information

**Ins:**  CHARITY CARE ALLOWANCE   **Insured:**  BAYSAVEVA, RITA

**Policy Number:**           **Group Number:**           **Rel:**

**Phone Number**                   **FIN**   SC

**Auth Number**

**Ins:**  NO FAULT         **Insured:**  BAYSAVEVA, RITA

**Policy Number:**  PENDING NO FA   **Group Number:**          **Rel:**

**Phone Number**                   **FIN**   NF

**Auth Number**

Patient Name **BAYSAVEVA, RITA**

Account Number **0800401218**

Medical Record No. **0001189969**

Date **1/4/2008**

ID 0800401218

# Lutheran Medical Center

## Emergency Department Record

BS

### History of Present Illness

46 Year Old Female Patient Presents with Head Trauma Occipital B for 1 Hour(s). The Onset is Acute. The symptoms are Mild, achey. Furthermore, the Patient/Family Denies LOC. Pt BIBA on stretcher s/p struck by slow moving vehicle, denies LOC, c/o pain to occiput, hematoma noted. Pt fully immobilized, seen by Dr. Simmons upon arrival. Pt also c/o neck pain, no signs of neuro deficit.

#### Review of Systems
(Symptoms and Signs not covered in the HPI)

| | | | | | |
|---|---|---|---|---|---|
| GU Neg | Neuro Neg | ENT Neg | Resp Neg | Musculoskeletal Neg | Hematologic/Lymphatic Neg |
| Skin Neg | Psych Neg | Heart Neg | GI Neg | Endocrine Neg | Allergic/Immunologic Neg |
| ☑ All other ROS negative | | | | Constitutional Sxs Neg | Eyes Neg |

☑ Vital Signs/Triage Note Reviewed    ☒ Hx unobtainable due to Tx urgency or poor historian(s)    ☒ Additional Information from Police, Ambulance, NH or Relatives    ☒ Old Medical Records Reviewed

**Past Medical History**    ☑ No Relevant PMH   ☒ Asthma   ☒ COPD   ☒ CAD   ☒ Cancer   ☒ CHF   ☒ CVA

Other PMHx    ☒ Diabetes   ☒ HTN   ☒ Psychiatric   ☒ Renal   ☒ Seizures

**Social History**    ☑ No Relevant SoHx   ☒ ETOH   ☒ Drugs   ☒ Smoking   Additional Sx

**Family History**    None

## Physical Exam    Exam Time    13:15

BS

| | |
|---|---|
| General Appearance | Awake, A&O x3 |
| HEENT | PERRL EOMI, Moist Mucous Membranes, No Icterus mild occip swelling |
| Chest | RRR No M   Lungs CTA No Ret Chest Wall NT |
| Abdomen | No Pulsating Masses BS-NL/No Bruits Soft, no tenderness/distension |
| GU | Normal |
| Extremities | Throughout all extremities Appearance Normal CBR < 2 sec Active ROM-Full Tenderness-None |
| Neuro | Major Muscle Groups 5/5 Gross Sensory Intact Normal Gait |
| Skin | Warm, moist, no pallor, no rashes |
| Back | No midline tenderness, no CVAT |
| Neck | No tenderness, full ROM, no JVD |
| Lymphatics | No lymphadenopathy |

## Repeat or Additional Exams

| MD | Notes | Time |
|---|---|---|
| BS | fells better..neck less tight..small hematoma occipital area ct scan neg | 14:16 |
| BS | No Sx(s) or Objective findings that are life or limb threatening. Medically Screened and Stable for disposition(Transfer) from the ED. | 14:18 |

Patient Name **BAYSAVEVA, RITA**

Account Number **0800401218**

Medical Record No. **0001189969**

Date **1/4/2008**

## Diagnostics

Specimen Collected / ECG _Rad Ordered

| MD Initials | Time | Diagnostic Ordered | Result Interpretation | Result Reviewed By | RN Initials | Time |
|---|---|---|---|---|---|---|
| WLF | 13:05 | Pulse Ox | Normal | BS | WLF | 13:05 |
| BS | 13:20 | C-Spine CT s contrast | 302- No evidence of acute fracture or dislocation.   Transcriptionist- JEN-FONG SHEN, RADIOLOGIST    Reading Radiologist- JEN-FONG SHEN, RADIOLOGIST    Releasing Radiologist- JEN-FONG SHEN, RADIOLOGIST    Released Date Time- 01/04/08 1404 , | BS | mte | 14:43 |
| BS | 13:21 | Head CT Absent Contrast | 103- Slight soft tissue swelling at left parietal scalp. Unremarkable study of head.    Transcriptionist- JEN-FONG SHEN, RADIOLOGIST    Reading Radiologist- JEN-FONG SHEN, RADIOLOGIST    Releasing Radiologist- JEN-FONG SHEN, RADIOLOGIST    Released Date Time- 01/04/08 1402 , | BS | mte | 14:43 |

## Medical Orders

| MD Initials | Time | Order | RN Initials | Time | Location-Response-Quantity | RN Remarks |
|---|---|---|---|---|---|---|
| BS | 14:22 | Compazine 10 mg PO | mte | 14:47 | | |
| BS | 14:22 | Motrin 600mg PO | mte | 14:47 | | |
| EHL | 16:07 | RN LOS 3 | EHL | 16:07 | | |

## MD Procedures

**Procedure Description**

| Time | 14:22 | | MD | WLF |
|---|---|---|---|---|
| Pulse Ox | | | | |
| | | | | 94760-26 CPT |

### Recommended LOS/CPT/ICD-9 Codes

Physician's LOS = 4    99284-25

Nurse's LOS = 3    611 APC

## Diagnoses

| Head Trauma | 959.01 ICD-9 |
|---|---|
| occipital hematoma | |

### RN Notifications

| MD Notified | Page Time | Num Pages | ResponseTime |
|---|---|---|---|
| Dr simmons | 16:06 | 1 | 16.10 |

| | MD | MD Time | | RN | RN Date/ Time | Admit to |
|---|---|---|---|---|---|---|
| **Disposition** | BS | 14:18 | Discharge Home | mte | 1/4/2008 | 14:43 |
| **Condition** | BS | 14:18 | Improved | mte | 12/30/1899 | 14:43 |

Physician (Print)    Simmons, Bonnie DO

Physician Signature    *Dr. Simmons*

Other Physicians
Simmons, Bonnie DO~

Patient Name **BAYSAVEVA, RITA**

Account Number **0800401218**

Primary RN (Print)  espinoza,mirtha

Medical Record No. **0001189969**

Date **1/4/2008**

Other Nurses

Freeburn, Wendy L, RN~valis, marian~Dones, Edwin~Lewis Boateng, Erma
H, RN~

This chart has been electronically signed via the EmpowER software.

Patient Name **BAYSAVEVA, RITA**

Account Number **0800401218**

Medical Record Number **0001189969**

Date **1/4/2008**

# Lutheran Medical Center
# Emergency Department

## Discharge Instructions

Discharge Date/Time **1/4/2008 4:07:21 PM**

### Diagnoses

Head Trauma

occipital hematoma

You have been evaluated today by an independent healthcare provider practicing Emergency Medicine. In most cases follow-up care is recommended with your regular Doctor, HMO or Clinic.

Within **2** days ☒ Doctor ☐ HMO ☐ Clinic

Call for appointment as soon as possible. IDENTIFY Yourself as an ER Patient. If you don't have a doctor or need a specialist follow up with:

Physician/Specialist **Sunset Park FHC - Medicine**

Address **Sunset Park FHC - Medicine Station 12 150 55th**

Phone **(718) 630-7942**

Additional Instructions:

**If the symptoms worsen or new symptoms develop return to the Emergency Department (ED) immediately. Call your doctor for additional questions.**

**ED phone number:**

return immed if sxs worsen otherwise follow up with your own doctor or our clinic

ice pack to occipital area for swelling and motrin for pain. **PATIENT HAS PRIVATE PHYSICIAN.**

---

Additional instructions were given on the following conditions:

☒ Abdominal Pain
☒ Allergic Reaction/ Rash
☒ Asthma/ Wheezing/COPD
☒ Back Pain
☒ Chest Pain
☒ Conjunctivitis
☒ Corneal Abrasion/Eye Injury
☒ Fever
☒ Fracture/Sprain/Contusion
☒ Gastritis/Ulcer
☑ Head Injury
☒ Headache
☒ High Blood Pressure
☒ Kidney Stone
Other

☒ Neck Strain
☒ Nose Bleed
☒ Middle Ear Infection
☒ PID/STD
☒ Sore Throat/Pharyngitis
☒ Threatened Abortion
☒ Toothache
☒ Upper Respiratory Infection
☒ UTI/Kidney Infection
☒ Vaginal Bleeding
☒ Vomiting/Diarrhea
☒ Wound Care/Sutures

Work/School Restriction:

☒ You may return to work/school today.

You may not return to work/school until:

☒ If you had x-rays or blood tests, please note that these don't always show what's wrong. Sometimes x-rays don't show broken bones. After review by a specialist you will be notified if there is an abnormality.

☒ You may not drive or operate heavy machinery because the medicines you have may make you sleepy.

---

Physician (Print)

Simmons, Bonnie DO

Nurse Signature:

X

Patient Signature

X

Patient Name  **BAYSAVEVA, RITA**

Account Number  0800401218

Medical Record No.  **0001189969**

Date  1/4/2008

# Lutheran Medical Center

## Emergency Department Nursing Notes and Vital Signs

| TimeEntered: | 1/4/2008 | 16:01 | Vitals Taken By: | EHL |
|---|---|---|---|---|

| Temperature | Pulse | | Blood Pressure | Respirations | Pulse Ox | Pain Scale |
|---|---|---|---|---|---|---|
| O  99.1 | Right | 83 | R  129/71 | 20 | 99% | **1 - mild** |
| T | Left | | L | | | |
| R | | | | | | |

## Nursing Notes

| Time Note Entered | | RN Initials | Note |
|---|---|---|---|
| 1/4/2008 | 14:47 | mte | PT ALERT AND OX3 SKIN WARM, LUNGS CLEAR BIL. 4 EXTREMITIES +ROM , C/O OF NAUSEAS, DENIES DIZZNESS OR HEADACHE, C/O OF WEAKNESS, MEDS GIVEN AS MD ORDERED |
| 1/4/2008 | 15:53 | EHL | Pt denies pain at this time condition is stable.  Re-evaluated by Md and s'cd home as ordered.  See Md orders for discharge instructions. Pt is  waiting to be pick up by family member. |
| 1/4/2008 | 16:02 | EHL | Pt left with  her daughter , ambulates with steady gait.  Discharge instructions given as ordered. |

| Primary Nurse Diagnosis | Primary Nurse Outcome | Achieved |
|---|---|---|
| See nurses notes | See nurses notes | Yes |

**Primary RN (Print)**   espinoza,mirtha

# Lutheran Medical Center Triage

**Category** 3 - Potentially lif

| Triage Date/Time | Waiting Rm Time | Exam Rm Time | Triage Nurse |
|---|---|---|---|
| 1/4/2008 13:02 | | 13:05 | Freeburn, Wendy L, RN |

| PCP Staff Status | Family Physician | Transported by | Mode |
|---|---|---|---|
| Not on Staff | Non LMC Physician | FDNY Ambulance | Stretcher |

**Historian** self

**Police Dept**
Custody      Notification      Beat #

**Chief Complaint**
head pain

**Onset Time** 1 Hour(s)    **Location** Street

## Associated Sxs / Pertinent History
Pt BIBA on stretcher s/p struck by slow moving vehicle, denies LOC, c/o pain to occiput, hematoma noted. Pt fully immobilized, seen by Dr. Simmons upon arrival. Pt also c/o neck pain, no signs of neuro deficit

## Past Medical Histor     Additional:
- [x] No Significant PMHx
- [ ] Asthma  [ ] COPD  [ ] CAD  [ ] Cancer  [ ] CHF  [ ] CVA
- [ ] DM  [ ] HTN  [ ] Psych  [ ] Renal  [ ] Seizures  [ ] Substance Abuse

## Medications
- [x] No Meds  [ ] Unknown

## Allergies
No Known Drug Allergies

**Immunizations UTD?** Unknown
TB Hx, PPD Pos or Exposures?   No
*If yes to TB or Infectious question take precautions*

## Mental Status / Psychological Eval

### Glascow Coma Scale
Eye
Verbal
Motor
Total

### OB/Gyn
LNMP      2 weeks ago
G    P    Ab    Miscarriages

### Lung Sounds

| | R | L | | Eyes | R | L |
|---|---|---|---|---|---|---|
| Clear | | | | Equal | | |
| Diminished | | | | Reactive | | |
| Wheezes | | | | Fixed | | |
| Rales | | | | Constricted | | |
| Rhonchi | | | | Dilated | | |
| Retractions | | | | Cataract | | |

### Skin
Color
Temp
Moist

### Extremities
Pulses
ROM

## Nutrition

## Fall Risk Assessment
No Fall Risks Identified

## Plan
CTrmt      **Time** 13:05
Triage Nurse: Freeburn, Wendy L, RN
Triage II:
Triage III: mte

## Domestic Violence Assessment
Are you being hurt by someone you live with or who takes care of you?
Yes/No   No
* Mandatory completion of Domestic Violence Referral.

## Functional D/C Planning
Daily Living      Independent
Living Conditions   Family
Going Home with    Self

## Assessing Patient's, Child's or Parent's readiness to learn
Primary Language    English
Assessed Disability   No Disability
Communication Barrier
Language Translator
Motivation Level    High
Knowledge Level    High
Comprehension Ability  High

- [ ] LWBS  [ ] LW Completed Tx/ Eloped  [ ] AMA  [ ] AMA Refused  [x] Patient Rights and Responsibilities and Guide to Pain Management given to Patient, Family, and/or Caretaker

## Patient Name
**BAYSAVEVA,RITA**

## Medical Record Number
0001189969

## Account Number
0800401218

| DOB | 10/28/1961 |
|---|---|
| Age | 46 Years |
| Gender | Female |

## Vitals

**Tem**
Oral      97.5
Rectal
Tympanic

**Pulse**
Right     75
Left

**Respirations**
18

**Blood Pressure**
Right     147/92
Left

**Pulse Ox**
97%

**Weight (Kg**
80 Kg

**Height**   **Head Circumference**
5'6'

**Pain Scale**
3 - moderate


# Emergency Department Pharmacy and Supply Charges

| Interventions | | |
|---|---|---|
| Intervention Name | Comments | Charge Code |
| Compazine 10 mg PO | | 0 |
| Motrin 600mg PO | | 0 |
| RN LOS 3 | | |

**Nurse LOS**      3        **611 APC**      **Charge Code**           0

<u>Order #6218654P   (CT C-SPINE W/O CONTRAST)</u>      <u>Result Date: 2008-01-04 13:59:00.0</u>

RESULT TEXT:
DIFF TYPE: CT-TRAUMA ROOMExam Start: 01/04/2008 14:30
Exam Stop: 01/04/2008 14:30Films Used: * NoneRead By: JS10952 JEN-FONG SHEN
RADIOLOGIST

Released By: JS10952 JEN-FONG SHEN  RADIOLOGISTStudy  CT of cervical spine
History/ TRAUMA
Multiple axial sections of spine were obtained from C1 to T1 at 2.5mm
intervals.
Finding
No evidence of acute fracture or dislocation is seen.
No significant spinal stenosis is noted.
The spinal curvature is normal. There is no definite bony destruction.
Impression
No evidence of acute fracture or dislocation.
   Transcriptionist- JEN-FONG SHEN, RADIOLOGIST
   Reading Radiologist- JEN-FONG SHEN, RADIOLOGIST
   Releasing Radiologist- JEN-FONG SHEN, RADIOLOGIST
   Released Date Time- 01/04/08 1404


<u>Order #6218655P   (CT CRANIAL W/O INFUSION)</u>     <u>Result Date: 2008-01-04 13:57:00.0</u>

RESULT TEXT:
DIFF TYPE: CT-TRAUMA ROOMExam Start: 01/04/2008 14:30
Exam Stop: 01/04/2008 14:30Films Used: * NoneRead By: JS10952 JEN-FONG SHEN
RADIOLOGIST

Released By: JS10952 JEN-FONG SHEN  RADIOLOGISTStudy   CT of head
History/ TRAUMA
Multiple axial sections of head were obtained without contrast injection.
There is slight soft tissue swelling at left parietal scalp.
The ventricles and subarachnoid space are normal in size.
No evidence of space occupying lesion or hemorrhage is seen. There is no
midline shift.
The sella/suprasellar area, posterior fossa and foramen magnum are
unremarkable.
There is no significant mucosal thickening in the paranasal sinuses. The
visualized orbits are unremarkable. The bony structures are intact.
Impression
Slight soft tissue swelling at left parietal scalp.
Unremarkable study of head.
   Transcriptionist- JEN-FONG SHEN, RADIOLOGIST   ·
   Reading Radiologist- JEN-FONG SHEN, RADIOLOGIST
   Releasing Radiologist- JEN-FONG SHEN, RADIOLOGIST
   Released Date Time- 01/04/08 1402



**EXHIBIT F**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------------X

RITA BAYTSAYEVA,

                Plaintiff,

                       Index No:

   - against -          09-CV-4874

MAKSIM SHAPIRO, SVETLANA ZIS,

               Defendants.

----------------------------------------------X

                5 Hanover Square
                New York, New York
                March 22, 2010
                10:20 a.m.

   EXAMINATION BEFORE TRIAL OF ANDREA ROSE, s/h/a

RITA BAYTSAYEVA, the Plaintiff, pursuant to Court

Order, taken at the above place, date and time,

before MARIA CIRILLO, a Notary Public within and

for the State of New York.

**6**

A. Rose

1
2 born in?
3    A.    Vladikauz.
4    Q.    Do you know how that is spelled?
5    A.    V-l-a-d-i-k-a-u-z.
6         MR. O'CONNELL:  Off the record.
7         (Discussion of the record.)
8    Q.    Could you spell the province or
9 whatever Republic you may have been born
10 because the court reporter will need that.
11    A.    Yes, short way is RSO/Alania,
12 A-l-a-n-i-a.
13    Q.    And at the time was that part of
14 the Union of Soviet Socialist Republic?
15    A.    Yes.
16    Q.    And it looks as though you have
17 recently undergone a name change, when did
18 your name change to Andrea Rose?
19    A.    I applied for citizenship
20 probably 2005 and 2009 I had my hearing April
21 so it was 2009. Maybe February.
22    Q.    That is when your name changed?
23    A.    Yes.
24    Q.    And are you a U.S. citizen?
25    A.    Yes.

**7**

A. Rose

1
2    Q.    And what time were you sworn in
3 as a U.S. citizen?
4    A.    Can you repeat?
5    Q.    When were you sworn in as a U.S.
6 citizen?
7    A.    2009.
8    Q.    In February?
9    A.    Yeah.
10    Q.    Okay. And when you became a U.S.
11 citizen your name changed?
12    A.    Yes.
13    Q.    And what was your name prior to
14 the name change?
15    A.    Prior name was Rita Baytsayeva.
16    Q.    And is that the name under which
17 this lawsuit was commenced, if you know?
18    A.    Yes.
19    Q.    And what is your Social Security
20 number?
21    A.    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.
22    Q.    And when did you move to the
23 United States?
24    A.    1998. Maybe 1999.
25    Q.    And when you first move to the

**8**

A. Rose

1
2 United States did you have some sort of a
3 visa which allowed you to move here?
4    A.    Yes.
5    Q.    What type of visa was that?
6    A.    I believe it was kind of 92 white
7 card they call it.
8    Q.    And prior to your being a U.S.
9 citizen were you authorized to work in the
10 United States?
11    A.    Yes.
12    Q.    And do you happen to remember the
13 number of that visa, if you had one?
14    A.    No. But I have my old passport,
15 I don't know if that has any. I don't know.
16    Q.    That is fine. Do you currently
17 have a United States passport?
18    A.    Yes.
19    Q.    Do you happen to know the number
20 of that passport?
21    A.    No.
22    Q.    Do you remember approximately
23 when the U.S. passport may have been issued?
24    A.    Oh yes, that was 2009 October.
25         MR. DRUYAN:  I will note for the

**9**

A. Rose

1
2 record I believe we submitted a copy of
3 the passport to you.
4         MR. O'CONNELL:  I do know that I
5 saw a copy of her previous passport. I
6 don't know if we have the United States
7 one. We may. I just may not know
8 offhand. I believe I saw a passport
9 from either the U.S.S.R. or whatever
10 prior republic may have been.
11    Q.    Do you currently possess a
12 driver's license?
13    A.    Nothing in the United States.
14 Nothing.
15    Q.    Do you possess any sort of New
16 York State identification?
17    A.    Yes. Yes, I do. I am not sure
18 if I have it with me.
19    Q.    Okay. Do you happen to know the
20 number of the identification?
21    A.    No.
22    Q.    Do you have it with you now?
23    A.    Maybe I do. I don't know.
24    Q.    If you wouldn't mind checking
25 please I would appreciate that.

A. Rose

1
2  Q.    And what is your current height?
3  A.    Five-four.
4  Q.    And at the time of this incident
5  was your height that also?
6  A.    Yeah.
7  Q.    Okay. And sorry to have to ask
8  this, what is your current weight?
9  A.    Yeah, well, 190. Yes, 190.
10 Q.    And on the date of the accident
11 what was your approximate weight?
12 A.    I believe 175.
13 Q.    And are your children United
14 States citizens?
15 A.    Yes.
16 Q.    Do you remember approximately
17 when they each of them became a United States
18 citizen?
19 A.    Marianna became a year later or
20 six months later after my citizenship so it
21 is going to be something like -- actually I
22 don't remember.
23        MR. DRUYAN: If you don't
24        remember just say it.
25 A.    I don't remember, she came after

A. Rose

1
2  me.
3        MR. DRUYAN: Good.
4  Q.    That is fine. And Alel and
5  Sarmat do you remember approximately when
6  they may have become U.S. citizens?
7  A.    They were under 18 years old they
8  granted citizenship with me but we still not
9  applied because it cost money I don't have.
10 Q.    And at the current address that
11 you live at, how long have you lived there?
12 A.    Five years.
13 Q.    And do you rent or own?
14 A.    It is rent.
15 Q.    And so just to be clear, that is
16 where you lived at the time of this accident?
17 A.    Yes.
18 Q.    The apartment unit 9G, is that
19 the same apartment unit you have lived in for
20 about five years?
21 A.    Yes.
22 Q.    And aside from your children does
23 anyone else currently live with you?
24 A.    No.
25 Q.    On the date of the accident aside

A. Rose

1
2  from your children?
3  A.    No one.
4  Q.    And if you can just briefly
5  describe your educational background for me
6  please?
7  A.    Um, okay. From Russia I have
8  high school and college. Here I have
9  associate's degree and some college. I
10 didn't finish college.
11 Q.    In Russia do you remember what
12 college you attended?
13 A.    Yes. Well, it is called like a
14 trade college, Soviet trade college. I don't
15 know how to translate it. But my occupation
16 was technology of production of the food.
17 Q.    Do you remember if you earned a
18 degree from that college in Russia?
19 A.    Yeah. I am technician of the
20 technology of food production. That is the
21 way I translate it.
22 Q.    Okay. That is fine. In the
23 United States what colleges, if any, have you
24 attended?
25 A.    ASA College of Excellence it is

A. Rose

1
2  called. That is the name of the college.
3  Q.    I am sorry, what is the name?
4  A.    ASA Institute of Excellence.
5  Q.    And when did you attend that
6  college?
7  A.    Maybe 2002 and 2004.
8  Q.    Did you also attend in 2003?
9  A.    Yes.
10 Q.    And did you earn a degree from
11 that institute?
12 A.    Yes, associate's degree medical
13 assistant.
14 Q.    What sort of work does that
15 degree prepare you to perform?
16 A.    Well, we can work everywhere
17 health care providers. But I did internship
18 in a doctor's office. Prepared patient for
19 diagnosis and all kind of treatment. We do
20 vital signs, echocardiogram, ultrasound,
21 specimen like a blood and urine specimen to
22 provided these things.
23 Q.    And are you currently a student
24 at all?
25 A.    I withdraw. Yeah, I wish I would

## 22

A. Rose

1  
2    A.   Classes last one hour,  
3 45 minutes, one hour and I had a break. I  
4 would usually go to library and we can sleep  
5 there a little bit.  
6    Q.   Would you then have another class  
7 after that?  
8    A.   That time, no. I had morning  
9 classes and evening classes. I had big break  
10 between the classes.  
11    Q.   And your evening class do you  
12 remember approximately how long those might  
13 take in terms of time?  
14    A.   Depends what kind of class. Some  
15 of them last longer I don't remember which  
16 one exactly. Some of them are shorter.  
17 English classes are short so probably one  
18 hour. Anatomy it was long class.  
19    Q.   During these classes were you  
20 seated during class time?  
21    A.   Yes, we sit.  
22    Q.   Were you able to sit for the  
23 entire course length?  
24    A.   Not that I was comfortable to sit  
25 but I forced myself to sit.

## 23

A. Rose

1  
2    Q.   And did you have any restrictions  
3 that kept you from fully participating in  
4 these courses?  
5    A.   One more time again please?  
6    Q.   I am just asking if you had any  
7 restrictions that kept you from fully  
8 participating in the courses, for example, if  
9 you had to do lab work were you prohibited  
10 from doing that just as an example?  
11    A.   Oh, no. No, no.  
12    MR. DRUYAN:  I am going to object  
13 to the form of the question. If you can  
14 phrase it for somebody with a 10-year  
15 presence or 14-year presence in the  
16 United States. I can try to help you.  
17    MR. O'CONNELL:  I will try to  
18 rephrase it this way and if we need to  
19 do it again that is fine too.  
20    MR. DRUYAN:  Yeah.  
21    Q.   During your classes in that  
22 semester in 2008, did your course work  
23 consist of doing any lab work?  
24    A.   No. Lab work you mean -- I don't  
25 know, to do something, right?

## 24

A. Rose

1  
2    Q.   Correct.  
3    A.   No, lecture, we don't have lab  
4 work. Math we don't do lab work also.  
5 Speech communication I was taking, no.  
6    Q.   And is part of those courses that  
7 you took in 2008, did it consist of any work  
8 in a doctor's office or in a hospital?  
9    A.   No, no.  
10    Q.   Okay. And when you were  
11 attending Long Island University did you  
12 participate in any sporting activities there?  
13    A.   Sport activities?  
14    Q.   Yes.  
15    A.   No.  
16    Q.   Did you participate in any what  
17 they call extracurricular activities meaning  
18 aside from your courses any other activities?  
19    A.   No. Well, some of the subjects  
20 are not counted towards the degree but we  
21 have to take them. For instance English  
22 classes my English was very low level so I  
23 needed to take this class but it is not  
24 counted as credit. That is what I took. But  
25 nothing like exact activities, no.

## 25

A. Rose

1  
2    Q.   No clubs or anything like that?  
3    A.   No.  
4    Q.   And I know you said you have  
5 approximately 60 credits left for that  
6 degree, do you know approximately how many  
7 you have earned so far?  
8    A.   From the 60 credits now I earned  
9 towards bachelor's degree I need 120 credits  
10 and I have 60 which are prerequisite. From  
11 the professional stage I don't have them.  
12 Yeah, I don't.  
13    Q.   But it sounds like you have  
14 earned approximately 60 credits and  
15 approximately 60 more to earn your degree?  
16    A.   Yes.  
17    Q.   Do you remember what your grade  
18 point average is in the nursing program?  
19    A.   Right now it is something -- GPA  
20 is about 3, sometimes 2.9, but over 3, B plus  
21 I earn, B minus, sometimes A, sometimes F.  
22    Q.   And aside from this lawsuit have  
23 you ever been a plaintiff in a personal  
24 injury lawsuit?  
25    A.   No.

VERITEXT REPORTING COMPANY

212-267-6868          516-608-2400

```
1              A. Rose
2   the accident?
3       A.    Well, yeah, it was coldest
4   coldest day of January.  Very cold.
5       Q.    Do you remember if it was raining
6   or snowing at all?
7       A.    No, it wasn't raining or snowing,
8   no.  It was just very cold day.
9       Q.    Do you remember if it was
10  overcast, sunny or something else?
11      A.    It wasn't really sunny.  It is
12  like normal day.  It wasn't cloudy.  It was
13  very sunny.
14      MR. DRUYAN:  Excuse me, you are
15  moving around, would you want to take a
16  break, go to the ladies room?
17      THE WITNESS:  Okay.
18      MR. DRUYAN:  You want to walk
19  around a little bit?
20      THE WITNESS:  Yes.
21      MR. O'CONNELL:  Okay.  No
22  problem.
23      (Whereupon, a short recess was
24  taken.)
25      Q.    Okay.  Do you remember what
```

```
1              A. Rose
2   street you were walking on when this accident
3   occurred?
4       A.    Bath Avenue.  We were crossing
5   Bath Avenue.
6       Q.    And the intersection where this
7   accident occurred, have you ever been at that
8   intersection before?
9       A.    Yes.
10      Q.    Do you know approximately how
11  many times?
12      A.    All the time.  I usually walk
13  through that cross section to work three
14  times a week.  Three times a week.
15      Q.    Was that on your way to and from
16  work or during work?
17      A.    Yes.  To and from, yeah.
18      Q.    And would you be able to describe
19  for me any traffic controls at the
20  intersection such as stoplights, stop signs
21  or anything like that?
22      A.    There is a light like cross
23  section lights, how do you call them?  Yes,
24  stoplight that is the way they call?
25      Q.    Yes.
```

```
1              A. Rose
2       A.    Yes, each corner there is
3   stoplights.
4       Q.    Were you in the street or on the
5   sidewalk when this accident occurred?
6       A.    We were crossing street.  We were
7   on the street, middle of the street.
8       Q.    Do you remember what direction
9   you were traveling in at that time?
10      A.    Yes.  But here on one corner is
11  the doctor's office, the office she went.
12  Here is the pizzeria so we were walking from
13  my direction towards -- I don't know how if
14  you stay this way it is going to be east,
15  from west to east.  I don't know.
16      Q.    Do you know what direction such
17  as north you may have been walking in?
18      A.    Towards east side maybe walking.
19  I am not good.
20      Q.    If you don't know that is okay
21  too.
22      A.    Yes, I am going to say I don't
23  know.  I am not good to describe the location
24  thing.
25      Q.    Do you remember approximately how
```

```
1              A. Rose
2   many feet from the sidewalk you were at the
3   time of the accident?  Meaning you were on
4   the sidewalk and stepped into the street, do
5   you know approximately how many feet you had
6   traveled?
7       A.    We cross almost the whole street.
8   We were almost to the other side where the
9   cross line go but feet, again I don't know
10  maybe five, ten.  I don't have a good image
11  to, you know.
12      Q.    If you are not sure that is fine.
13      A.    I just know that we were almost
14  crossing the cross line, white line in the
15  middle of the street.  We were either there
16  or a little bit further there.  That is how I
17  remember.
18      Q.    When you say "there" do you mean
19  you were almost to the other sidewalk you
20  were attempting to reach?
21      A.    Yes.
22      Q.    And were you walking in the
23  crosswalk at the time of the accident?
24      A.    Uh-huh.
25      Q.    And do you recollect what color
```

9 (Pages 30 to 33)

A. Rose

1 understand your question. If the vehicle
2 used the lights, yes. It was her light too.
3 It was for the turn. For the turn it was her
4 light too.
5     Q.    Do you know if the vehicle had a
6 green light to travel or was there another
7 color light controlling its movement?
8     A.    Probably green, yes. Maybe she
9 had green light. Don't know.
10     Q.    The cross street that the vehicle
11 was traveling from, do you know if in
12 addition to its regular traffic lanes had a
13 specific left turn lane for her to turn?
14     A.    No, I don't understand.
15     Q.    Well, for example, my question is
16 there are some streets that have regular
17 traffic lanes and some that will have an
18 additional lane for people making turns.
19     A.    No. No, this is just regular
20 cross section, no.
21     Q.    And do you remember how long
22 prior to the impact you first saw the
23 vehicle?
24     A.    I am not good at estimating

A. Rose

1 things. I don't know, maybe minute, maybe,
2 maybe two minutes. I don't know, it was
3 really fast.
4     Q.    I know you mentioned it was a
5 silver minivan; is that correct?
6     A.    Yes.
7     Q.    Would you be able to offer me any
8 other description of the vehicle in addition
9 to that?
10     A.    No. I am not good, you know,
11 what type of car it was. I don't know. It
12 is a minivan, big and silver color.
13     Q.    Okay. I believe you testified a
14 moment ago that you saw the vehicle for one
15 to two minutes prior to the impact; is that
16 correct?
17     A.    Yeah.
18     Q.    Do you know approximately how far
19 away from you the vehicle may have been when
20 you first saw it?
21     A.    First I saw probably -- I saw her
22 on the corner. Just on the corner when she
23 reached the corner from the crosswalk. She
24 was still behind us. How far it was?

A. Rose

1     Q.    When you first saw the vehicle at
2 that corner, do you know approximately how
3 far the vehicle was from you?
4     A.    Maybe 50 feet, maybe 20 feet. I
5 don't know.
6     Q.    And in the 24 hours prior to this
7 accident had you consumed any alcohol?
8     A.    Oh, no.
9     Q.    And at the time of this accident,
10 did you have any prescription medications
11 that you were supposed to take?
12     A.    No.
13     Q.    And had you taken any other sort
14 of nonprescription medication or narcotic in
15 the 24 hours prior to this incident?
16     A.    No.
17     Q.    Do you remember approximately
18 what time you woke up on the day of this
19 incident?
20     MR. DRUYAN: Objection. I think
21 she woke up twice if she was
22 unconscious.
23     MR. O'CONNELL: No, no. I am
24 asking the morning of the incident when

A. Rose

1 she first got up.
2     MR. DRUYAN: That is what I am
3 saying.
4     A.    I woke up early 6:00.
5     Q.    You woke up approximately
6 6:00 a.m.?
7     A.    Yes.
8     Q.    And prior to the incident that
9 day, had you eaten anything?
10     A.    Yeah.
11     Q.    Do you remember what you ate?
12     A.    I ate bagel. Morning I usually
13 ate bagel, cream cheese.
14     Q.    Do you remember approximately
15 what time that may have been?
16     A.    Around 9:00.
17     Q.    And I believe you testified a few
18 moments ago that you traveled through the
19 intersection approximately three times a
20 week; is that correct?
21     A.    Yeah. More than three times if
22 you count exactly sometimes I go to shop to
23 this specific place. So be six times but
24 three times, yeah. It is very common place.

A. Rose

Q. Do you remember what type of doctor he was?

A. Yeah, podiatrist, foot doctor.

Q. A podiatrist?

A. Yeah, podiatrist.

Q. And approximately how long were you at the doctor's office prior to the accident?

A. Maybe 40 minutes, 30 minutes.

Q. And I believe you first woke up that day at approximately 6:00 a.m.; is that correct?

A. Uh-huh.

Q. Do you remember approximately how many hours you slept before waking up at 6:00 a.m.?

A. We usually go to bed 11:00. So it is going to be how many hours? Seven.

Q. Okay. That is fine. And do you remember what clothes you were wearing on the day of the accident?

A. Yeah. I had the winter coat very heavy like furry. I don't know how you call that. And I have sneakers. I had simple

A. Rose

clothing. I had a hat. That is all.

Q. Did your hat block your vision at all?

A. No.

Q. And you mentioned you were wearing a winter coat, do you remember approximately how far down your legs that coat goes?

A. Yes, all the way to my calf, long.

Q. To your calf. The shoes that you were wearing, do you remember approximately how old they were?

A. Yeah, they were old. They were a year old probably, maybe more.

Q. And at the time of the accident were you carrying anything such as a purse or anything else?

A. I don't remember. Maybe I had my purse. I should have.

Q. And at the time of the accident were you using a cellular phone?

A. No.

Q. Were you using any other

A. Rose

electronic devices such as a BlackBerry or anything?

A. No.

Q. Were you wearing headphones and listening to music?

A. No.

Q. And do you wear glasses or any type of corrective lenses?

A. No.

Q. Do you remember approximately the time of the last eye exam that you had prior to this accident?

A. Probably the summer 2008 -- no, no, just 2007 before that summer.

Q. And at the eye exam did they mention any problems with your vision?

A. No.

Q. And I believe you mentioned that Ms. Pildish, P-i-l-d-i-s-h, that she was using a walker; is that correct?

A. That is correct.

Q. Did you need to assist her with using the walker at all?

A. I don't have to touch her

A. Rose

directly. She walks by herself. But I do have to assist her too in case something like -- well, I didn't exactly was my obligation to do, walk straight, to look down or up, things like that. I don't have to hold her under arm or something.

Q. So Ms. Pildish when she used a walker didn't need assistance from you; is that correct?

A. That is correct.

Q. If she ever had to walk up any stairs would you ever have to assist her?

A. Yes.

Q. And when the accident occurred do you remember where Ms. Pildish was compared to you, for example, was she in front of you, to your left or some other place?

A. She was just one feet in front of me on my left side. On my left side.

Q. The vehicle that struck you, do you remember which direction it came from, for example, your left, your right or another direction?

A. Yes, from my right. From my

Page 54

```
 1              A. Rose
 2      A.   I was thrown back to the
 3  beginning of the crosswalk.  Almost so there
 4  would be how many feet, probably six, seven.
 5      Q.   You think you may have been
 6  pushed approximately six or seven feet; is
 7  that accurate?
 8      A.   Uh-huh.
 9      Q.   And when you were pushed back
10  that distance were you in the air at any
11  point?
12      A.   Yes.  I flipped on my head and --
13  in the air?
14      Q.   Were you in the air at any point,
15  for example, did your feet leave the ground
16  at any point?
17      A.   Yes.
18      Q.   Do you know approximately how far
19  off the ground you may have gone?
20      A.   Off the ground I fell on my head
21  like this so I don't know.
22      Q.   When you landed did your head hit
23  the ground?
24      A.   Yes.
25      Q.   Do you remember what part of your
```

Page 55

```
 1              A. Rose
 2  head may have hit the ground?
 3      A.   Right back here, this particular
 4  part they call this the back of head
 5  (indicating).
 6      Q.   And did you lose consciousness at
 7  any point?
 8      A.   I wasn't sure.  I don't know.  At
 9  some point I saw the man standing on top of
10  me and my head was -- under my head they put
11  -- somebody put his scarf, that is a moment I
12  don't remember.  I assuming I was kind of
13  unconscious.  I don't know how long.  I was
14  confused whatever it was.  I just don't
15  remember how it happened.
16      Q.   Do you remember approximately how
17  much time may have elapsed between the impact
18  and your looking up at that man?
19      A.   No.
20      Q.   When you say that man do you know
21  that person's name?
22      A.   No.
23      Q.   Would you be able to describe
24  that person for me?
25      A.   He is in his middle-age man,
```

Page 56

```
 1              A. Rose
 2  American.  I don't know nothing else.
 3      Q.   What, if anything, may he have
 4  said to you, if you remember?
 5      A.   He told me they called ambulance
 6  already.
 7      Q.   Do you know who may have called
 8  the ambulance?
 9      A.   I believe he did.
10      Q.   And I am sorry if I asked you
11  this, do you know that person's name?
12      A.   No.
13      Q.   Did he wait with you until the
14  ambulance got there?
15      A.   Yes.  Yes, they were still there.
16      Q.   Was your head bleeding at all?
17      A.   There was little cut but bleed
18  like, no.  Hematoma, no.  Little bleed I
19  found on my head.
20      Q.   So, I am sorry, were you bleeding
21  or not?
22      A.   Not bleeding like bleeding, no.
23  I wasn't bleeding on the floor or something,
24  no.
25      Q.   Did you have any cuts on your
```

Page 57

```
 1              A. Rose
 2  head?
 3      A.   Yes, cuts I meant.  Yeah, I had
 4  cut.
 5      Q.   And did you have any bumps on
 6  your head at that time?
 7      A.   Yes.
 8      Q.   Could you describe those bumps
 9  for me?
10      A.   Yes, a huge from all the way here
11  almost I had bigger like that (indicating).
12  It was big area so you can feel with your
13  hand because small area you would define like
14  this (indicating).  What the big all around
15  in the head feeling other the core and it is
16  like rising (indicating).
17      Q.   Do you remember approximately how
18  big the bump may have been?
19      A.   Like that (indicating) ten maybe,
20  ten centimeters.
21      MR. DRUYAN:  Want to stipulate it
22  looks like four inches?  You may have a
23  ruler in the office.
24      MR. O'CONNELL:  Right.
25      A.   For me I get use to count
```

VERITEXT REPORTING COMPANY

212-267-6868                516-608-2400

A. Rose

2     Q.    Okay. Did you have any problems
3 with your vision at this time?
4     A.    Not directly, no. That time, no.
5     Q.    Do you know if the driver had any
6 passengers in her vehicle?
7     A.    Seemed to me she was alone.
8     Q.    And do you remember approximately
9 how long it took for the ambulance to get
10 there?
11     A.    I remember when I thought it was
12 pretty long maybe an hour. I don't know.
13     Q.    You think it may have been an
14 hour or you are not sure?
15     A.    I think maybe it will be hour,
16 yes.
17     Q.    And during this time do you know
18 where Ms. Pildish was?
19     A.    No.
20     Q.    Did you inquire about her at all?
21     A.    Yes. I heard she was screaming.
22 She was arguing with the girl, that is what I
23 know she is there.
24     Q.    Do you remember what she may have
25 said during that argument?

A. Rose

2     A.    Yeah, she was cursing. She was
3 cursing her.
4     Q.    Do you know what the driver may
5 have said in the response?
6     A.    Yes. I heard, she said it was my
7 light. At this point I was like oh, my God.
8     Q.    Do you know if Ms. Pildish was on
9 the ground, standing or in some other
10 position?
11     A.    That I don't know.
12     Q.    Do you know if the vehicle struck
13 her walker at all?
14     A.    Walker?
15     Q.    Yes.
16     A.    Yeah. Yes. Walker was struck,
17 yes.
18     Q.    Did it also strike Ms. Pildish's
19 body at all?
20     A.    This I don't know.
21     Q.    And do you remember if the walker
22 was damaged in any way from this accident?
23     A.    I don't know. Just ripped from
24 my hands and I don't know after that. Well,
25 later on she told me, we in ambulance

A. Rose

2 together she said my walker fly all the way.
3 I don't know where it is. Some people
4 brought her that walker. I know from her
5 words but I don't know.
6     Q.    Do you know how far the walker
7 may have flown?
8     A.    No.
9     Q.    Did you leave the walker there at
10 the intersection or was it brought with you
11 in the ambulance?
12     A.    I don't know.
13     Q.    Did you have your hands on the
14 walker at all at the time of the incident?
15     A.    Yes.
16     Q.    And which hands, if any?
17     A.    My right hand.
18     Q.    Your right hand was on the
19 walker?
20     A.    Yes.
21     Q.    And what part of the walker was
22 it on?
23     A.    Okay. It was the right side of
24 the walker is kind of key shape like that so
25 left side where she hold I try to like

A. Rose

2 protect the part. I don't know. I don't
3 remember. I don't remember.
4     Q.    Did you have your hands on Ms.
5 Pildish's body at the time of the accident?
6     A.    No. That was in my mind should I
7 pick her up, should I tear her away. What
8 should I do. And I couldn't estimate my
9 ability to hold her. Because she had a hip
10 fracture and I was aware of that, if I drop
11 her directly I might not be able to hold her
12 and I could drop her or something. So I know
13 for sure I didn't touch her because of that.
14 I was aware of that.
15     Q.    She had a hip fracture prior to
16 this incident?
17     A.    Yes.
18     Q.    And do you know if the vehicle
19 that struck you sustained any damage from
20 this accident?
21     A.    I don't know.
22     Q.    And where were you traveling with
23 Ms. Pildish at the time of accident, for
24 example, were you going back to her house or
25 somewhere else?

VERITEXT REPORTING COMPANY

A. Rose

1  
2 treatment after the accident. When the  
3 ambulance arrived do you remember how many  
4 ambulance personnel there were?  
5     A. I remember lady. There was lady.  
6     Q. Okay. Do you know if she was by  
7 herself, did she have any other worker?  
8     A. She had another worker. They  
9 were communicating with each other. I just  
10 didn't see anybody.  
11     Q. Do you remember if it was a man  
12 or woman?  
13     A. Probably man, yeah.  
14     Q. The lady ambulance worker, would  
15 you be able to describe her for me at all?  
16     A. No.  
17     Q. Do you remember anything that she  
18 may have said to you?  
19     A. No. She just give me some  
20 instruction like she give me ice on my head,  
21 ice pack. And she make me take off the coat,  
22 otherwise she said they going to cut.  
23 Probably to take blood pressure or something.  
24 That is all.  
25     Q. Do you remember anything you may  

A. Rose

1  
2 have said to her?  
3     A. Oh, I told her don't give me  
4 anything like make me unconscious. Something  
5 I was -- I said to not give me anything  
6 strong, right, no medication. She said she  
7 is not going to do.  
8     Q. Did she ask you if you felt any  
9 pain?  
10     A. I don't remember, no. I was  
11 answering a lot of questions. I don't know  
12 if she asked me. I answered probably. I  
13 don't know. I don't remember.  
14     Q. After the ambulance arrived do  
15 you remember how long you remained on the  
16 ground?  
17     A. No. They pick me up quite soon  
18 after that to the ambulance. But in  
19 ambulance we were staying quite long  
20 period of time. And Ms. Pildish was in there  
21 but then they took her to the ambulance also.  
22 And my count was so long it was my perception  
23 probably. I wanted sooner. I don't know.  
24 Seemed to me long. I don't know, we were  
25 still staying and the police were questioning  

A. Rose

1  
2 me.  
3     Q. But between the time when the  
4 ambulance arrived and when they placed you in  
5 the ambulance, do you know approximately how  
6 long that may have been?  
7     A. It was quick. It wasn't long.  
8 They just transferred me right away.  
9     Q. And when you were moved into the  
10 ambulance did they do anything to stabilize  
11 your neck or head?  
12     A. Yeah, they did. I remember now  
13 somebody they wearing this plastic thing.  
14     Q. So they put some plastic around  
15 your neck to stabilize your neck?  
16     A. Yes.  
17     Q. And when you were moved into the  
18 ambulance did they lift you, were you able to  
19 get up or how did it occur?  
20     A. I wasn't able to get up. They  
21 put me on something. I don't know, they have  
22 quite good things, mechanical things or they  
23 pull me into the carriage thing.  
24     Q. Did they put you in a wheelchair  
25 to move you into the ambulance?  

A. Rose

1  
2     A. No, not wheelchair. It is like a  
3 bed with wheels. I don't know how it is  
4 called. Even I am in nursing program still.  
5     Q. Is it possible the word stretcher  
6 might be a good description of what they put  
7 you on or would it be something else?  
8     A. Maybe, maybe. It wasn't  
9 wheelchair. It would be sitting kind of  
10 chair. Here you were laying down.  
11     Q. And whatever device they put you  
12 on that you were laying on, did you remain on  
13 that device when you were in the ambulance?  
14     A. Yes.  
15     Q. Did they give you any medications  
16 while you were in the ambulance?  
17     A. I don't remember. I just  
18 remember telling her don't give me strong  
19 something. And she gave me just ice she  
20 said. Ice pack on my head and she checked  
21 the blood pressure something. She requested  
22 me to take of whatever it is, I was in a  
23 heavy coat and she pulled my arm to take the  
24 blood pressure. That is all I remember.  
25     Q. Do you remember if there were any  

VERITEXT REPORTING COMPANY

```
1           A. Rose
2           (Whereupon, a short recess was
3      taken.)
4      Q.    And when you arrived at the
5 hospital, do you know how long you had to
6 wait before you received any treatment from
7 the hospital personnel?
8      A.    More than 10 minutes probably.
9      Q.    And do you remember who you first
10 spoke to at the hospital, for example, a
11 nurse, a doctor or somebody else?
12     A.    There was some young man who was
13 asking about my insurance things. Then
14 doctor came so I talked to the doctor first.
15     Q.    What did you say to him?
16     A.    I told him -- she asked me where
17 the pain and everything and I said my head.
18     Q.    Do you remember the doctor's
19 name?
20     A.    No.
21     Q.    At the hospital did they take any
22 X-rays or MRI films of you?
23     A.    They took C scan -- no, not --
24 yeah, C scan, CT scan.
25     Q.    They take a CT scan of your head?
```

```
1           A. Rose
2      Q.    Do you remember approximately how
3 long you were at the hospital?
4      A.    Until the night, yeah, evening,
5 it already was dark.
6      Q.    Do you remember approximately
7 what time you may have left the hospital?
8      A.    Maybe 6:00 p.m.
9      Q.    And how did you get home?
10     A.    My daughter came for me so she
11 took me home.
12     Q.    And did they give you any walking
13 devices such as cane or anything else?
14     A.    No.  She didn't diagnose me for
15 concussion which usually they do if there is
16 a head trauma. She didn't do anything. And
17 I didn't want to leave the hospital because I
18 knew I was vomiting there. I got a blackout
19 when they told me I don't have -- basically
20 they scan me for if there is a bleeding
21 inside of the brain and she said there is no
22 bleeding. But I couldn't hold myself to told
23 her, I don't see. My eyes are black, I see
24 just black and vomiting.
25     Q.    You vomited at the hospital?
```

```
1           A. Rose
2      A.    Yes.
3      Q.    Any other films that were taken?
4      A.    No.
5      Q.    And what, if any, other treatment
6 did you receive at the hospital?
7      A.    They give me some painkillers.
8      Q.    Were those prescription
9 painkillers or nonprescription?
10     A.    I don't know.  She gave it to me
11 and said that is going to help you and if I
12 want to go home I could go home.
13     Q.    Did they diagnose you with any
14 injuries at the hospital?
15     A.    No.  She indicated head trauma
16 but personnel nurses they were arguing with
17 her that she should order X-rays on shoulder
18 and everywhere. But they said -- well, they
19 had kind of not nice response about her. I
20 asked her to please help me to get good
21 doctor and do not neglect me, that is what I
22 told her.
23     Q.    It sounds like those X-ray films
24 did not occur; is that correct?
25     A.    No.
```

```
1           A. Rose
2      A.    Yes.
3      Q.    Approximately how many times, if
4 you remember?
5      A.    Two times.
6      Q.    And you had some vision problems
7 at the hospital; is that correct?
8      A.    Yes.
9      Q.    And would you be able to describe
10 those problems?
11     A.    The nurse came to me and say you
12 can get up and move and I said I can't lift
13 myself. She assisted and that is when I saw
14 black everything, my eyes opened, I could not
15 see anything just a black screen like that.
16     Q.    You saw black?
17     A.    Yes.
18     Q.    Approximately how long did that
19 black vision last?
20     A.    I believe seconds because I
21 couldn't hold myself and I fell back.
22     Q.    And did it occur again before you
23 left the hospital?
24     A.    Yes, but the -- yes.
25     Q.    And how many times did it occur
```

A. Rose

have been on?

A. It is Neck Road maybe.

Q. Do you remember the name of the doctor there that treated you?

A. No.

Q. Had you ever been to that doctor before?

A. No.

Q. How were you referred to that doctor?

A. It is not a close friend but the woman she lives over there where the accident occurred. I knew her earlier. So she called me she asked me how I am doing. And she gave me those -- that doctor's address. So we went with my daughter to there. But then they were okay. There I saw the chiropractor and he diagnosed me for the concussion and also they provided some treatment. And they referred me for MRIs. But because it is far I found myself not able to go back there. It takes the car service and it is expensive and I couldn't go there. So I found another doctor here and uptown 200 Dyker Street, it

A. Rose

is Dr. Miller. So I was visiting her, Dr. Miller.

Q. And when did you first see Dr. Miller?

A. Approximately maybe the 10th or 5th of January.

Q. Of 2008?

A. Yes.

Q. And how were you referred to Dr. Miller?

A. Who referred me to Dr. Miller?

Q. Yes.

A. By the time I called the lawyer, accident lawyer so they give me her address here. I asked them if they knew anybody and they give them to me.

Q. And when did you -- I don't want to get into any discussion you had with your attorneys, when did you first call an accident lawyer?

A. Maybe a week later. At that time maybe 10th of January or 5th, between that time.

Q. And did Dr. Miller diagnose you

A. Rose

with any injuries?

A. Well, she reported whatever my complaints were and headaches and everything, my back pain revealed later on when my dizziness gets better and I was up and attempt to do things. Attempt to wash dishes or do something around the house. Then I start feeling my back pain. So in the beginning I just reported my dizziness, my head so they did physical therapy. Oh, I complained my jaws were -- I couldn't talk. I couldn't open my mouth, my ears, my face, my neck.

Q. But did Dr. Miller diagnose you with any injuries that you remember?

A. No. She diagnosed me for the head trauma that is all.

Q. When did you first feel pain in your back?

A. Like month later.

Q. A month after the accident?

A. Uh-huh. Maybe three weeks later.

Q. Where did you feel the pain in your back?

A. Rose

A. When I started washing the dishes I realized more than five minutes I can't stay on top of sink right away the right side and my shoulders and everything. I complained to her, Dr. Miller, I said I didn't know. I remember, yes, I heard some jerk like this in my back but all the time I was worried about my head and I didn't care if I have any other problems in my body. I was worried about my head, my vision, my hearing, all those were most important. And now kind of getting better I could stay straight and I started washing dishes and I can't do it.

Q. But did you feel it, for example, pain in your lower back, somewhere else specific in your back?

A. Yeah, my lower back exactly and if I tend to ignore that, the pain radiates to the right leg all the way down to the foot.

Q. And do you currently have any vision problems as a result of this accident?

A. Yes.

A. Rose

1 injections you were given?
2     A.    Steroid.  I don't know.
3     Q.    I am just going to go through the
4 authorizations that counsel provided as well.
5 Did you ever treat with a Dr. Kuhn, K-u-h-n,
6 at 57th Street?
7     A.    Yes, I forgot, I am sorry.  I am
8 still seeing him, yes.
9     Q.    What sort of doctor is he?
10     A.    He is a neurologist.
11     Q.    And when did you first see him?
12     A.    Probably 2009 in April or May.
13 April maybe.
14     Q.    Do you still treat with him?
15     A.    Yes.
16     Q.    And how many appointments total
17 have you had with him, if you remember?
18     A.    I usually see him every month
19 since then and we started therapy things
20 right now because of the case from the
21 workers' compensation was stopped just
22 January now.  So I am seeing him every week
23 one time.
24     Q.    You have seen him approximately

---

A. Rose

1 once a week since approximately April of
2 2009; is that accurate?
3     A.    No, from 2009 April I see him
4 every month.
5     Q.    Okay.  And what sort of treatment
6 does he provide to you?  I know he is a
7 neurologist.
8     A.    He takes care of my medication,
9 my depression and fact that I am not able to
10 concentrate and memory problems, for all of
11 that he is treating with the medication.
12     Q.    Have you been diagnosed with
13 depression?
14     A.    Yes.
15     Q.    And when were you first diagnosed
16 with depression ever in your life?
17     A.    By Dr. Kuhn.  I am not sure if
18 Dr. Marina Neystat also diagnosed that.  But
19 I told her.  Yeah, Dr. Marina Neystat I was
20 telling it was 2009.  In January by Dr.
21 Marina Neystat.
22     Q.    How do we spell that doctor's
23 name?
24     A.    First name M-a-r-i-n-a.

---

A. Rose

1     Q.    Okay.
2     A.    Last name N-e-s-t-a-t [sic].
3     MR. DRUYAN:  For the record, I
4 believe it is there is an authorization
5 for that doctor.
6     MR. O'CONNELL:  Actually there is
7 an authorization it looks like her last
8 name is spelled N-e-y-s-t-a-t.
9     A.    Yeah, that is correct.
10     Q.    When did you first treat with Dr.
11 Neystat?
12     A.    It was 2009 either January or
13 February approximately.
14     Q.    Why did you go to see her?
15     A.    Because I needed Dr. Miller
16 didn't provided any treatment for my
17 neurological problems.  And after a while I
18 start feeling I really messed up my nerve
19 system.  I totally forgetting things, simple
20 things which turn off the stove and think you
21 locked the door and my daughter will come
22 home, mom, door was open.  So on and on all
23 kinds of things.  So Dr. Miller didn't treat
24 this.

---

A. Rose

1     So I was looking for neurologist
2 and the pain different type of pains start on
3 my body which was not treated also that just
4 the physical therapy I was going and I didn't
5 feel this relief.  It was even worse.  My
6 spine feels like electrocuting me, paralyzing
7 me.  All kind of every different type of
8 pain.  So I didn't even know it is a
9 neurological problem or different problem
10 until I saw Dr. Neystat.
11     Q.    Did anyone refer you to Dr.
12 Neystat?
13     A.    Yes.  I had lawyer, her name was
14 Irena Yman (phonetic), she referred me to
15 her.  I complained about these problems and I
16 told her I need a neurologist.
17     Q.    And what did Dr. Neystat diagnose
18 you with, if any?
19     A.    Fibromyalgia.
20     Q.    And what sort of treatment did
21 she give you for fibromyalgia?
22     A.    Lexapro.
23     Q.    And where did you fill that
24 prescription?

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

A. Rose

A. I don't know, maybe one session of 12 appointments that is what I figure out then another. And summer I skip because I was taking vocational training and then I come back again. I don't know. Maybe 30.

Q. So 30 appointments you're saying?

A. Yes, for the physical therapist. I supposed to see her every month.

Q. Did they have you do any exercises at that facility with Nestor?

A. No, I don't do exercise at the facility, I do it at home. They give you just instruction how to do the exercise.

Q. What types of exercises did you do at home?

A. For the back. For the back pain. The problem was I have to mostly lean down and lift legs and when I do lean down I have the dizziness in my head so I couldn't fully, you know, accomplish the things they asked me to do.

Q. How often were you supposed to do those exercises?

A. Every day.

A. Rose

Q. Did you wound up doing them every day?

A. Yes, now I do them.

Q. And approximately how long every day are you supposed to do the exercises?

A. I do ten times each specific exercise for the shoulders, for the back, for the legs, for the arms ten times. Some of them I count all the way to 50 times. It last sometimes 20 minutes I guess or more, little more. I do it morning and at night two times.

Q. Did you also treat with a Dr. Perry?

A. Dr. Perry was an independent doctor from the insurance company. He just -- he didn't give me treatment, he just evaluated.

Q. Oh, that is through workers' comp?

A. Yes.

Q. And there is a facility F-e-g-s, We Care?

A. Yes, that is what I told -- now I

A. Rose

remember --

MR. DRUYAN: I am just going to note for the record there may be an attachment.

MR. O'CONNELL: Oh, there is a one-page attachment to this authorization for Fegs We Care located 80 Vandam, V-a-n-d-a-m, Street, New York New York.

A. Yes. This is from the public assistance case, yes.

Q. Okay. And was that what you mentioned previously where --

A. Yes. On Broadway you asked me what facility and this probably. But I now remember on Broadway probably is another independent doctor which I was for evaluation being sent to him. It is Clayman or Claterman or something his name is.

Q. Did you undergo any treatment or take any courses at NYU Rusk Institute?

A. NYU Rusk Institute I attempted to go back to work and I enter the work force. They offer do some vocational training but

A. Rose

today before evaluating so that last 15 days of basically taking tests, physical performance and mental like math and English and everything that was at Rusk Institute.

MR. DRUYAN: I am going to ask Ms. Rose to sign an authorization for the physical therapist who was at Rusk so I will give you this and ask her questioning about the physical therapist.

THE WITNESS: I am not sure it is a physical therapist. I don't know.

MR. DRUYAN: Okay.

Q. It looks like a Dr. Alyssa, A-l-y-s-s-a --

A. Yes.

Q. Malaspina, M-a-l-a-s-p-i-n-a, did you treat with her?

A. Yes, she evaluated.

Q. Was that part of the Rusk Institute?

A. Yes.

Q. And what did she evaluate you for?

A. Rose

2  Q.   Do you remember when the decrease
3  to a $100 occurred?
4  A.   Maybe September 2009.
5  Q.   And what, if any, Social Security
6  benefits have you received?
7  A.   No, nothing.
8  Q.   Did you file the Social Security
9  claim?
10  A.   I filed but I don't have any
11  benefits.
12  Q.   Okay.  And when did you file the
13  claim, if you remember?
14  A.   When I was attending the We Care.
15  It was 2009 maybe in March or April.
16  Q.   And did they give you any reason
17  why they wouldn't give you Social Security
18  benefits?
19  A.   No.
20  Q.   When were you informed that you
21  were not going to get any Social Security
22  benefits?
23  A.   Um, 2009 maybe July 2009.
24  Q.   Did you have to go to an office
25  to file that claim?

A. Rose

2  A.   That facility over here they fill
3  out for me.
4  Q.   Have you ever been a member of a
5  labor union?
6  A.   Labor union, no, it is
7  professional something.
8  Q.   For any employment that you ever
9  had in the United States, have you ever
10  belonged to a union?
11  A.   No.
12  Q.   Going back to your employment
13  with Omega, am I correct in thinking that was
14  your employer at the time of this accident?
15  A.   Yes.
16  Q.   And when did you first begin
17  working for Omega?
18  A.   May of 2005 would be accurate I
19  guess.
20  Q.   And when did you first get
21  assigned to work with Ms. Pildish, if you
22  remember?
23  A.   December 2006.  December 2006,
24  right.
25  Q.   Okay.  And during the course of

A. Rose

2  your working for Ms. Pildish, were you always
3  just working Friday through Sunday?
4  A.   Yes.  Sometimes I work more when
5  I was off from my school.  I mean the breaks,
6  spring break and Christmas break.
7  Q.   And I don't know if I asked this
8  yet but I just want to be clear.  Prior to
9  this accident did you use any walking aids
10  like a cane or anything like that?
11  A.   No.
12  Q.   Did any doctors prescribe you any
13  canes or other walking aids at any point
14  after the accident?
15  A.   Yes.
16  Q.   And which doctors were those?
17  A.   I don't remember.
18  Q.   Do you remember when you first
19  started using the cane?
20  A.   Yes -- oh yes, from Rusk
21  Institute.  I was seeing a doctor also.
22  Before somebody prescribed but I didn't want
23  to take it.  It is depressing me more to
24  acknowledge that I am disabled.  I don't want
25  to think of myself.  But then Dr. Yellen I

A. Rose

2  saw from the Rusk Institute.  He didn't give
3  me any reports also but he convinced me also.
4  Either way it will help in public places and
5  everything.
6  Q.   When did you first start using
7  the cane?
8  A.   I use it at home all the time
9  before I was like dizzy all the time I was
10  using.  But outside I start using recently.
11  January was the snow, a lot of snow and I
12  needed to go out in the court so I decided to
13  take it.  It is snow and slippery.
14  Q.   Did you say you needed to go to
15  court?
16  A.   Yeah, from the workers'
17  compensation.
18  Q.   Have you ever attended a workers'
19  compensation hearing?
20  A.   Yeah, we went to hearing.
21  Q.   And when was that?
22  A.   That was what, February.  Is this
23  February month?
24  Q.   This is March currently.
25  A.   Then it was 10th of February.

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

A. Rose

1  classes located?
2  Q.  On Court Street also in the same
3  A.
4  vicinity Omega's office, 44 Court Street.
5  Q.  How many days of classes did you
6  attend?
7  A.  It is only one day but it is
8  morning to evening.
9  Q.  Do you know approximately how
10  many hours it was?
11  A.  I start from nine to five. I
12  don't know how many hours.
13  Q.  And when you worked with Ms.
14  Pildish how many hours a day did you work
15  with her typically?
16  A.  Twelve and a half hours.
17  Q.  Did you receive overtime pay for
18  working 12 hours a day or just a straight
19  time rate?
20  A.  No, straight time because
21  40 hours it is like 26 hours a week.
22  Q.  Okay.  Aside from the vocational
23  training you underwent at Rusk and your one
24  day of orientation class at Omega, have you
25  performed any other employment since this

A. Rose

1  accident?
2  A.  No.
3  MR. DRUYAN:  That is for Dr.
4  Yellen at Rusk.  You have one for Rusk
5  and Yellen and Rusk and Malaspina at
6  Rusk.
7  Q.  I am sorry, just to be clear,
8  aside from the vocational training and the
9  one day orientation class with Omega, have
10  you performed any other employment since this
11  accident?
12  A.  No.
13  Q.  Has any doctor ever told you that
14  you are unable to perform employment duties?
15  A.  Yes, Dr. Levinson and Dr. Kuhn.
16  Q.  Did they say you are totally
17  disabled, partially disabled or something
18  else?
19  A.  I remember by my records that I
20  am totally disabled from Dr. Levinson and Dr.
21  Kuhn also.
22  Q.  Now, are you totally disabled
23  from performing your old job or any sort of
24  job?

A. Rose

1  A.  Any sort of job that was up to
2  Rusk Institute if I want to change jobs.  So
3  I don't know anything about them what they
4  decide to do with me.  I talk to my
5  counselor, he told me he is trying to put me
6  in a comfortable place that will be applying
7  to my condition.  But he said I have to have
8  records from Dr. Yellen who he referred me to
9  and I called him recently and he said I still
10  don't have any records and I don't know what
11  to do with you.
12  Q.  When you were working at Omega
13  were you paid by check or by some other
14  method?
15  A.  By check.
16  Q.  Did they issue you a W-2 for your
17  taxes?
18  A.  Yes.
19  Q.  Did the vocational training you
20  underwent at Rusk, do you remember what that
21  consisted of?
22  A.  Vocational training we performed
23  some kind of physical task to assemble
24  details together, to screw things that

A. Rose

1  required specific positions of body positions
2  specifically.  We also did like do you know
3  counting.  When you work on register a lot of
4  numbers to adding things to get total number.
5  Also we did like logical, mechanical,
6  evaluating that.  A lot of tests they usually
7  from 9 to 1:00.
8  Q.  Okay.  How long did the training
9  last, for example, one week, two weeks or
10  something else?
11  A.  Fifteen days.  From 9 to 1:00
12  with hour break.
13  Q.  With your household chores,
14  things such as cooking and cleaning and so
15  on, are you able to perform those tasks the
16  way you could prior to this accident?
17  A.  No.
18  Q.  Could you describe the
19  limitations that you have in that regard?
20  A.  Well, I have washer machine but I
21  don't have a dryer so I have to hang them on
22  the lines like that.  I raise my head up like
23  that.  Washing dishes is tragedy for me
24  because I would rather stay straight but not

31 (Pages 118 to 121)

A. Rose

2     Q.   Did you sustain any bone
3 fractures due to this incident?
4     A.   No.
5     Q.   Were you pregnant at the time of
6 this incident?
7     A.   No.
8     Q.   Have you lost the use of any of
9 your body organs as a result of this
10 incident?
11     A.   Organs?
12     Q.   Any internal organs?
13     A.   No.
14     Q.   Just to briefly go back into the
15 depression which doctors again diagnosed you
16 with depression?
17     A.   Dr. Marina Neystat.
18     Q.   What are the symptoms of your
19 depression that you feel?
20     A.   I don't know. I want to be
21 alive. I was very active person. If I do
22 not do exercise like activity exercise, I am
23 going to bake a cake for my children or make
24 some dress for my daughter. I am sorry.
25     Q.   It is okay.

A. Rose

2     MR. DRUYAN: I don't have
3 tissues. Note for the record she is
4 like sniffling. Do you want to give her
5 tissues?
6     MR. O'CONNELL: We will go off
7 the record for a minute.
8     (Discussion off the record.)
9     (Whereupon, a short recess was
10 taken.)
11     A.   What I am trying to say activity
12 like painting or sewing designs or anything
13 was like something that will energize me
14 because people might think if I'm alone I
15 will be totally kind of depressed.
16     First of all, my education took
17 me very -- engaged me into life and all those
18 activities also. Now when I trying to make
19 the little things I find myself not able to
20 do those things. So I don't know how am I
21 going to do the rest of my life.
22     I came here to succeed, even I
23 was alone with three children. They going to
24 grow up and finish high school and still have
25 time for myself to progress. And those

A. Rose

2 things are -- I don't know. I still going to
3 do. I am still going to go to college. But
4 definitely probably not going to nursing. It
5 is probably going to be something different
6 probably.
7     Q.   Did you also have an MRI of your
8 spine taken with a Michelle Rubin, R-u-b-i-n?
9     A.   Yes.
10     Q.   Okay.
11     MR. O'CONNELL: Just off the
12 record.
13     (Discussion off the record.)
14     A.   He read my films that I took East
15 something Manhattan Diagnostic.
16     Q.   Dr. Rubin reviewed the films that
17 were taken at the East Diagnostic Center, the
18 one that we discussed earlier?
19     A.   Uh-huh.
20     MR. DRUYAN: I know I gave you
21 East Diagnostic authorization.
22     MR. O'CONNELL: Yes, you did.
23     Q.   Aside from the CVS pharmacy that
24 we discussed, did you go to any other
25 pharmacies to fill any other prescriptions?

A. Rose

2     A.   No.
3     Q.   And are you currently taking any
4 medications?
5     A.   Yes.
6     Q.   Which medications are those?
7     A.   I taking diazepam, Valium. I am
8 taking Ambien for sleep. Yeah, because I
9 wouldn't sleep sometimes two, three days in a
10 row.
11     MR. DRUYAN: And I just ask that
12 your record reflect that she is
13 mumbling.
14     A.   Diazepam, Ambien, oh, yes,
15 amphetamine salt that helping to concentrate.
16 I look at numbers, I look at things and I
17 don't see the number I need. Laughing but it
18 is depressing me.
19     Q.   Do you know how that is spelled
20 the last medication?
21     A.   I have those medication, I took
22 them with me. This for depression.
23     MR. DRUYAN: Want to just give
24 them to the reporter.
25     MR. O'CONNELL: I will read them

134

```
 1
 2          CERTIFICATE
 3
 4    I, MARIA CIRILLO, a Notary Public within
 5  and for the State of New York, do hereby
 6  certify:
 7    That the witness whose deposition is
 8  hereinbefore set forth, was duly sworn by me
 9  and that the within transcript is a true
10  record of the testimony given by such
11  witness.
12    I further certify that I am not related to
13  any of the parties to this action by blood
14  or marriage and that I am in no way
15  interested in the outcome of this matter.
16    IN WITNESS WHEREOF, I have hereunto set my
17  hand this _____ day of _____, 2010.
18
19
20        _____
21          MARIA CIRILLO
22
23
24
25
```

135

```
 1
 2        WITNESS'S CORRECTION SHEET
 3    PAGE \ LINE \ CORRECTION
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20
21        _____
             ANDREA ROSE
22
23  Subscribed and sworn to before me
24  this _____ day of _____, 2010
25  _____, Notary Public.
```