UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
RITA BAYTSAYEVA,

               Plaintiff,

          - against –

MAKSIM SHAPIRO, SVETLANA ZIS,

              Defendants.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

09 CV 4874

DEARIE, District Judge.

     Plaintiff, a 50-year-old former medical assistant born in the former U.S.S.R.[1] and now a

U.S. Citizen, alleges that defendants negligently struck her with their car while she was crossing

the street on foot, causing severe and continuing physical and emotional injuries. Defendants

move for summary judgment, arguing that plaintiff is barred from recovery in tort because she

has not sustained a "serious injury" pursuant to New York Insurance Law § 5102(d). Because

plaintiff has plainly met her burden of establishing a *prima facie* case of "serious injury," the

defendants' motion for summary judgment is DENIED.

## I. BACKGROUND

### A. The Accident

     On January 4, 2008, while crossing the street at the intersection of Bath Avenue and 23rd

Street in Brooklyn, New York, plaintiff was struck by a car allegedly driven and/or owned by

defendants. ECF Docket # 34 at 21-25, Complaint ("Compl.") ¶¶ 1, 4-9, 11-12. At the time of the

accident, plaintiff was employed by Omega Health Services as a "home attendant" and when

struck, was assisting an elderly client cross the street. ECF Docket # 32, Plaintiff's Exhibit ("Pl.

---

[1] Plaintiff's deposition and affidavit discussed <u>infra</u> reveal that English is not plaintiff's primary language. For ease of reading, I will, therefore, refrain from using the "[sic]" marker when quoting from any of plaintiff's statements.

Exh.") K., Affidavit of Plaintiff ("Pl. Aff.") ¶ 1; see ECF Docket # 34 at 45-50, Defense Exhibit

("Def. Exh.") D., Plaintiff's Response to Interrogatories ("Pl. Inter.") ¶ 8. The circumstances

surrounding and immediately subsequent to impact are not entirely clear. According to plaintiff,

"[t]he car struck my right side, I fell back on the pavement hitting my head. I was thrown back

and down to the black ground. I was trying to get up, I couldn't I fell back down again. I passed

out while on the ground." Pl. Aff. ¶ 2. In her deposition, plaintiff was unsure whether she lost

consciousness. ECF Docket # 34 at 63-81, Deposition of Plaintiff, 3/22/10 ("Pl. Dep.") at 55

("Q. And did you lose consciousness at any point? A. I wasn't sure. I don't know. . . . I assuming

I was kind of unconscious."). In any event, plaintiff remained laying on the street until an

ambulance arrived, at which point, she was placed on a stretcher, given a neck brace and ice, and

transported to Lutheran Medical Center ("Lutheran"). Id. at 70-73.

Upon arrival at Lutheran, the triage physician noted that plaintiff "[p]resents with Head

Trauma Occipital B . . .. The Onset is acute. The symptoms are Mild, achey [sic]. . . . [She is]

fully immobilized . . . [and] also c/o [(complains of)] neck pain . . .." ECF Docket # 34 at 51-62,

Def. Exh. E., Lutheran Medical Report ("Luth. Rep.") at 3. The Lutheran Report notes that

plaintiff had no relevant past medical history and prior to the accident was not taking any

medications. Id. at 3, 8.[2] A physical examination revealed full range of motion ("ROM") of

plaintiff's extremities, back and neck; a CT scan of the spine revealed "[n]o evidence of acute

fracture or dislocation;" and a CT scan of the head revealed "[s]light soft tissue swelling at left

parietal scalp." Id. at 3, 4, 10. Plaintiff was diagnosed with "head trauma" and "occipital

hematoma" and prescribed medications for inflammation, pain, and severe nausea. Id. at 4, 6.

---

[2] The Lutheran Report of no prior medication comports with plaintiff's deposition testimony that "at the time of accident [she did not] . . . have any prescription medications that [she was] supposed to take," Pl. Dep. at 40, and that before admission to Lutheran, she requested that the "lady ambulance worker . . . not give [her] anything strong, right, right, no medication." Id. at 70-71.

After determining that there were "[n]o Sx(s) [(symptoms)] or objective findings that are life or limb threatening[,]" plaintiff was released from the emergency department with instructions to contact a physician for a follow up appointment within two days and "return [to the hospital] immed [(immediately)] if sxs [(symptoms)] worsen . . .." Id. at 3-4, 6. Plaintiff was later picked up by her daughter and left the hospital walking "with steady gait." Id. at 7.

B. Doctor Miller and First Year of Treatment (January 2008 – January 2009)

Five days later, on January 9, 2008, plaintiff visited Doctor Jean D. Miller, M.D. ("Dr. Miller")[3] "seeking medical attention secondary to unremitting pain, which started the day, the accident [sic]" with numerous complaints, both psychological and physical. ECF Docket # 33-1, Pl Exh. M., Miller Comprehensive Medical Initial Report at 1.[4] After reviewing plaintiff's hospital records, observing that plaintiff had no significant past surgical or trauma history, and listening to plaintiff's complaints, Dr. Miller conducted a "thorough physical examination," including, but not limited to ROM testing of the cervical spine/neck, thoracic spine, and lumbar spine. Id. at 2-3.  With regard to plaintiff's cervical spine/neck, Dr. Miller found severe loss of ROM of between 43% to 88%, central neck pain, and "significant tenderness," "severe spasm," and "[t]ender points" throughout. Id. at 2. Although there was full ROM in plaintiff's thoracic and lumbar spine, the doctor noted pain in both areas, as well as "significant tenderness," "severe

---

[3] Plaintiff was referred to Doctor Miller by her "accident lawyer." Pl. Dep. at 87.
[4] Plaintiff submitted her medical evidence in a highly disorganized fashion, with reports of different doctors interspersed within different named Exhibits, including numerous duplicate copies of many reports. Plaintiff submits a sworn affidavit of Dr. Miller as Exhibit B, in which the doctor "swear[s] to the truth of my medical reports for Ms. Batsayeva," including workers' compensation forms filled out on her behalf. ECF Docket # 30-3, Pl. Exh. B, Miller Affidavit ¶ 5. Although Dr. Miller's reports were all unsworn and then interspersed throughout different Exhibits, they are still considered admissible for purposes of this summary judgment motion. See, e.g., Lazu v. Integral Truck Leasing, 741 N.Y.S.2d 196, 196 (N.Y. App. Div. 2002) ("[S]worn affidavit, which incorporated by reference . . . prior unsworn reports, is sufficient to raise a triable issue of fact as to whether plaintiff sustained a serious physical injury . . .."); Weaver v. Town of Penfield, 891 N.Y.S.2d 795, 797-98 (N.Y. App. Div. 2009) (considering doctor's workers' compensation report in determination of whether plaintiff made prima facie showing of "serious injury" under New York Insurance Law).

spasm," and "[t]ender points" throughout. Id. at 3. Based on the foregoing, Dr. Miller made the following diagnostic impression:

> Headache, post concussion syndrome, head injury, TMJ syndrome, vertigo/dizziness, anxiety, nervous tension, acute reaction to stress, insomnia, post-traumatic cervical sprain/strain, R/O cervical intervertebral disc injury, cervical & brachial radiculitis, cervical myalgia/myofascitis, R/O internal derangement of R/L shoulder, sprain/strain of R/L shoulder and upper arm, sprain and strain of thoracic spine, contusion of chest wall R/L, lumbar sprain/strain, R/O lumbosacral radiculopathy, lumbar intervertebral disc injury, lumbar myalgia/myofascitis.

Id. at 4. The doctor prescribed Elavil for depression and Esgic for headaches, ordered an x-ray of the right and left temperomandibular joint,[5] and recommended supervised physical therapy multiple times per week. Id. at 4-5. The doctor further ordered that "because [of] her injuries no heavy work should be performed at this time." Id. at 4.

Plaintiff began physical therapy right away and according to detailed daily physical therapy progress notes taken by Dr. Miller—ostensibly based off of first hand reporting by plaintiff's physical therapist—plaintiff attended physical therapy sessions two and three times per week between January 10, 2008 and March 10, 2008, the first two months post-accident, and one and three times per week from March 10, 2008 through May 19, 2008. ECF Docket # 33-1, Pl. Exh. M., Miller Daily Physical Therapy Progress Notes. Physical therapy included thermotherapy, electrotherapy, and massage therapy to the lumbosacral spine, left and right shoulder, thoracic spine, and cervical spine. Id.

Nevertheless, plaintiff's symptoms did not improve. In the report from plaintiff's follow-up visit on February 13, 2008, for example, Dr. Miller indicated that plaintiff's "symptoms have gotten worse since the previous examination." Pl. Exh. M., Miller 2/13/2008 Follow-Up Visit Report at 1. Though testing revealed that the cervical spine's ROM had *slightly* improved (now

---

[5] The X-Ray indicated "no evidence of fracture." ECF Docket # 33-2, Pl. Exh. M (continued).

indicating loss of ROM between 10-50% across all motion categories), Dr. Miller reported 33%

loss of ROM of extension and left lateral flexion in plaintiff's lumbar spine, where no loss had

previously existed. Id. at 1-2. Dr. Miller noted pain throughout plaintiff's body, that plaintiff

reported experiencing headaches three times per day, and was not sleeping well. Id. Although the

primary diagnoses remained the same, Dr. Miller ordered an MRI and added Neurontin to the list

of plaintiff's medications. Id. at 5.

Between March 19, 2008 and July 23, 2008, Dr. Miller examined plaintiff once a month.

See Pl. Exh. M., Miller 3/19/2008, 4/21/2008, 5/7/2008, 6/11/2008, 7/23/2008 Follow-Up Visit

Reports.[6] At each visit, plaintiff complained of daily headaches, severe pain primarily in her

neck and lower back, and sleeping issues, as well as dizziness and anxiety. See id. According to

plaintiff, the symptoms affected her ability to carry out daily tasks.[7] During this period, loss of

ROM in plaintiff's cervical spine/neck ranged from a low of 0% across all motion categories

without pain to and high of 50% in left and right lateral flexion with pain. Id. Loss of ROM in

plaintiff's lumbar spine ranged from 33% in right and left rotation to between 33% and 66% in

extension, all with pain.[8] Id. The MRI of plaintiff's cervical spine—ordered by Dr. Miller in

January—was performed on April 2, 2008 and revealed that "small diffuse annular bulges and/or

---

[6] Dr. Miller's July 23, 2008 report was included in Plaintiff's Exhibit H. See ECF Docket #31, Pl. Exh. H.

[7] See Pl. Aff. ¶¶ 6, 10 ("I can't cook, vacuum clean, shop for groceries . . . for . . . myself and my family, without pain in my back and body, all movement is with great difficulty. . . . I also have dizziness and problems keeping my balance when standing or walking . . . ."); Pl. Dep. at 88-89 ("Q. When did you first feel pain in your back? A. Like a month [after the accident]. . . . Q. Where did you feel the pain in your back? A. When I started washing the dishes I realized more than five minutes I can't stay on top of sink right away the right side and my shoulders and everything. I complained to her, Dr. Miller, I said I didn't know. I remember, yes, I heard some jerk like this in my back but all the time I was worried about my head and I didn't care if I have any other problems in my body. I was worried about my head, my vision, my hearing, all those were most important. And now kind of getting better I could stay straight and I started washing dishes and I can't do it.")

[8] No ROM testing was performed on 5/17/2008 or 7/23/2008. See Pl. Exh. M., Miller 5/17/2008, 7/23/2008 Follow-Up Visit Reports at 1-2. Additionally, there were no reports in the record between 7/23/2008 and the last Dr. Miller follow-up report in the record dated 10/13/2008. See Pl. Exh. M. On October 13, 2008, Dr. Miller reported no loss of ROM for either the cervical or lumbar spine, although pain was noted in the lumbar ROM testing. Pl. Exh. M., Miller 10/13/2008 Follow-Up Visit Report at 1-2.

osteophytic ridges are seen at C5-6 [and] C6-7 without spinal cord compression or foraminal encroachment." ECF Docket # 34-2 at 40-49, Def. Exh. K. ("MRI Reports") at 8.

During Dr. Miller's treatment, which transpired during at least the first ten months following the accident, plaintiff did not work a single day and as described more fully, infra Part I.E., has not worked a day since. See Pl. Aff. ¶¶ 4-7. Plaintiff filed for, was awarded, and began receiving workers' compensation benefits soon after the accident, which continued up to at least January 2011. See Pl. Aff. ¶ 5; ECF Docket # 30-7, Pl. Exh. G., Kuhn Workers' Compensation Forms, 1/6/2011. Dr. Miller filed sworn workers' compensation reports, eight of which—ranging from January 10, 2008 to January 9, 2009—are included in the record, all indicating that there was no "history or evidence of pre-existing injury, disease or physical impairment;" that plaintiff is "disabled from regular duties or work;" that plaintiff's disability is "total;" and that plaintiff "can[not] . . . do *any* type of work." Pl. Exh. M., Miller Workers' Compensation Forms, 1/10/2008-1/9/2009 (emphasis added).[9]

Although plaintiff did not—and could not, according to Dr. Miller—return to work, plaintiff did continue to attend morning and evening courses and completed the Spring 2008 semester at the Long Island University Hospital where plaintiff was in the middle of completing a Bachelor of Arts in nursing.[10] ECF Docket # 24, Defendants' Memorandum of Law in Support

---

[9] Inexplicably, Dr. Miller checked "No" in response to the query of whether "the occurrence . . . [was] the complement producing cause of the injury . . . sustained." Id. Given that many of Dr. Miller's diagnoses were explicitly causally related to the accident (i.e. "*post-traumatic* cervical intervertebral disc injury" and "*post-traumatic* lumbo-sacral sprain with secondary pain syndrome," Pl. Exh. M., Miller 10/13/2008 Follow-Up Visit Report at 3-4 (emphasis added)) and the fact that the doctor indicated that plaintiff had no pre-existing condition in both the doctor's initial evaluation and all workers' compensation forms, the "No" cause notation in all workers' compensation forms is a likely error that unintentionally repeated itself.

[10] It is unclear whether plaintiff returned to school immediately as Plaintiff's Response to Interrogatories state that she was "confined to bed 1/4/08 DATE ACCIDENT, TO Feb. 4, '08 completely due to concussion herein, and injuries, and occasionally thereafter to date and continuing." Pl. Inter. ¶ 5. Moreover, defendants' Reply Affirmation in Further Support of their Motion for Summary Judgment states that plaintiff "was enrolled as a full-time student

of their Motion for Summary Judgment ("Def. Mem.") at 2; ECF Docket # 30, Plaintiff's Memorandum of Law in Opposition to Summary Judgment ("Opp. Mem.") ¶ 7. She withdrew, however, after the semester because of her injuries,[11] and at least as of her March 2011 deposition, had not attended school since.[12]

C. Dr. Neystat and Treatment (January 2009 – November 2009)

In January 2009, plaintiff stopped seeing Dr. Miller and began to see Doctor Marina Neystat, M.D. ("Dr. Neystat"), a Diplomat of the American Board of Neurology and Psychiatry. See ECF Docket # 30-4, Pl. Exh. C., Neystat Affidavit at 1. According to plaintiff, Dr. Miller did not provide treatment for what plaintiff feared were potentially far more extensive neurological problems. See Pl. Dep. at 96-97. In addition, her pain was getting far worse and was transferring to different parts of her body: "I didn't feel this relief. It was even worse. My spine feels like electrocuting me, paralyzing me. All kind of every different type of pain." Id. at 97.

At a January 19, 2009 initial neurological and physical examination with Dr. Neystat plaintiff complained of "ssevere [sic] neck pain, right leg pain 8/10 burning as well as severe low back pain . . . positional vertigo . . . memory loss, confusion, inability to sleep . . . [and] up to 5 episodes a day of confusion and disorientation." ECF Docket # 31, Pl. Exh. H., Neystat

---

for 74 of the first 90 days immediately following the accident." ECF Docket # 34, Exh. 2, Defendants' Reply Affirmation in Further Support of Their Motion for Summary Judgment ("Def. Reply") at 4.

[11] Although defendants submit that "Plaintiff admitted that she had no restrictions on any of her class-work as a result of the alleged injuries after the accident," Def. Mem. at 2, the deposition testimony that defendants cite to does not support this statement. The defendants' attorney asked whether the plaintiff "had any restrictions that kept you from fully participating in the courses, for example, if you had to do lab work were you prohibited from doing that just as an example?" Pl. Dep. at 23. It is clear from the context of the testimony that plaintiff's answer of "Oh, no. No, no[,]" referred to the lab work specifically, which she then testified was not a part of the program at all. Id. at 24. Additionally, just prior to being asked about her limitations to lab work, plaintiff testified that she was not "comfortable to sit but I forced myself to sit." Id. at 22.

[12] See Pl. Dep. at 17 ("Q. And are you currently a student at all? A. I withdraw. Yeah, I wish I would . . ."); Pl. Aff. ¶ 6 ("Because I can't mentally concentrate. I can't work at a job, or go to school. My visions is blurred, I can't memorize the lessons in school, or take tests, to advance my career.").

Neurology Initial, 1/19/2009 at 1.[13] Dr. Neystat noted that plaintiff's "[p]ast medical history is unremarkable" and that plaintiff had not had any "previous surgeries." Id. The neurological exam—though the specific test employed was unspecified—revealed an "anxious and depressed" mood, but no "abnormal or psychotic thoughts." Id. at 2. A "musculoskeletal examination" revealed "cervical and lumbar right and left paraspinal tenderness and muscle spasms." Id. at 3. A ROM test revealed that the thorasic spine and neck ROMs were within normal limits, but that the "[l]umbar sacral spine . . . shows decreased flexion, decreased extension, decreased R Tilt, decreased R Rotation." Id. Although Dr. Neystat's ROM testing included no numeric percentages, her office's physical therapist conducted ROM and "Manual Muscle" Testing, which revealed losses of ROM in plaintiff's neck across all motion categories of between 21% to 33% and losses of ROM in plaintiff's trunk across all motion categories of between 43% and 66%. ECF Docket # 31, Pl. Exh. H., 1/20/2009 Physical Therapy Evaluation at 2. Dr. Neystat concluded that plaintiff was "totally disabled," diagnosed "[p]ostconcussion syndrome . . . [a]djustment disorder with depression [and] . . . [c]ervical and lumbar radiculopathy." Pl. Exh. H., Neystat Neurology Initial, 1/19/2009 at 3. Dr. Neystat prescribed Lexapro for depression and anxiety, recommended that plaintiff begin physical therapy with her office's physical therapist, and ordered an "EEG and EMG and nerve conduction studies lower extremeties [sic]," as well as an MRI of the brain and lumbar spine. Id.

The "EMG needle evaluation of the Right MedGastroc and the Right LatGastroc . . . reveal[ed] evidence of lumbar L5-S1 radiculopathy on the right." ECF Docket # 34-2, Def. Exh. L. at 86, Neystat Test Results. The MRI of the brain, conducted on February 12, 2009, found that

---

[13] Plaintiff submits a sworn affidavit of Dr. Neystat as Exhibit C, in which the doctor "swear[s] . . . to the truth of all the reports I prepared for [plaintiff] during my treatment of her," including medical reports and workers' compensation forms filled out on her behalf. Pl. Exh. C., Neystat Affidavit ¶ 5. Although Dr. Neystat's reports are all unsworn, they are still considered admissible for purposes of this summary judgment motion. See discussion and cases cited, supra note 4.

"Nonspecific mild white matter signal abnormalities," MRI Reports at 1, but "no evidence of disease," Pl. Exh. H., Neystat 4/2/2009 Follow-Up Visit Report at 1, and the MRI of the lumbar spine, conducted on March 16, 2009, showed that plaintiff had a "left paracentral herniated disk with mild focal narrowing of the thecal sac" at L1/2 "with mild spinal canal stenosis."[14] MRI Reports at 4.

The record contains three more reports of follow-up visits with Dr. Neystat through September 10, 2009, during which the doctor conducted the same physical and neurological testing as described above and found no reason to change her diagnoses. See Pl. Exh. H., Neystat 4/2/2009, 7/9/2009, 9/10/2009 Follow-Up Visit Reports. Follow-up ROM tests conducted by Dr. Neystat's physical therapist on March 5, 2009 and September 10, 2009 demonstrated continued, significant losses of ROM.[15] See ECF Docket # 34-2, Def. Exh L. at 65-67, 3/5/2009 Physical Therapy Follow-Up Report; Pl. Exh. E., 9/10/2009 Physical Therapy Follow-Up Report. All of Dr. Neystat's reports reflect that plaintiff was experiencing intense pain (i.e. 6 through 9 on a scale of 10), in her neck, legs, and back, severe headaches, an inability to sleep, memory loss, confusion, and disorientation. See Pl. Exh. H., Neystat 4/2/2009, 7/9/2009, 9/10/2009 Follow-Up Visit Reports. Between January 21, 2009 and November 2, 2009, Dr. Neystat filed workers'

---

[14] Attached to their Reply Affirmation, defendants append a medical report prepared by Doctor Douglas C. Schottenstein, M.D. ("Dr. Schottenstein"), who reviewed all MRIs and diagnosed: "1. Cervical radiculitis, 2. Lumbar L4—L5 radiculitis, 3. White matter changes per MRI." ECF Docket # 34-3 at 20-22, Shottenstein Evaluation at 3. The doctor concluded: "I feel that there is a direct causal relation between the accident described and the patient's current injuries." Id. at 4. Although Dr. Schottenstein's report is unsworn, defendant's act of submitting such unsworn medical records has "open[ed] the door for plaintiff to rely upon these same unsworn or unaffirmed reports and records in opposition to the motion." Kearse v. New York City Trans. Auth., 789 N.Y.S.2d 281, 283 n.1 (N.Y. App. Div. 2005); see also Persaud v. URS Midwest, Inc., No. 06 CV 3119(JG)(JMA), 2007 WL 4556908, at *4 (E.D.N.Y. Dec. 21, 2007) (Gleeson, J.) ("'A reference to . . . unsworn or unaffirmed reports in [a defendant's] moving papers is sufficient to permit the plaintiff to rely upon and submit these reports in opposition to the motion.'") (quoting Kearse)

[15] The March 5, 2009 testing revealed losses of ROM in plaintiff's neck across all motion categories of between 22% to 33% and loss of ROM in plaintiff's trunk across all motion categories of between 27% and 50%. Def. Exh. L., 3/5/2009 Physical Therapy Follow-Up Report at 66. The September 10, 2009 testing revealed loss of ROM in plaintiff's neck across all motion categories of between 21% to 33% and loss of ROM in plaintiff's trunk across all motion categories of between 43% and 66%. Pl. Exh. E., 9/10/2009 Physical Therapy Follow-Up Report at 2.

compensation forms, all of which state that there is "no evidence of pre-existing condition;" that plaintiff is "disabled from regular duties or work;" that plaintiff's disability is "total;" that plaintiff "can[not] do any type of work;" that the "injury result[s] in permanent restriction, total or partial loss of function of a part or member, or permanent facial, head, or neck disfigurement;" and that the January 4, 2008 accident was "the competent producing cause of the injury . . . sustained." ECF Docket # 30-5 & 31, Pl. Exhs. E., H., Neystat Workers Compensation Forms 1/21/09-11/2/2009.

D. Dr. Kuhn and Treatment (June 2009 to Present)

While seeing Dr. Neystat, plaintiff also began to see Doctor Daniel Kuhn, M.D. ("Dr. Kuhn"), a New York State certified psychiatrist and Diplomat of the American Board of Neurology. ECF Docket # 30, Pl. Exh. A. at 1-4, Kuhn Affidavit. Dr. Kuhn originally saw plaintiff on June 3, 2009 for the first of three 75-minute intake examinations, which formed the basis for an "Initial Neuropsychiatric Evaluation Report," dated July 13, 2009.[16] See Pl. Exh. A., Kuhn Initial Neuropsychiatric at 1. During the three sessions, in addition to interviewing plaintiff and reviewing plaintiff's medical history, records, and test results, Dr. Kuhn performed a Memory Test, Digit Span Tests, Beck Depression Inventory ("BDI"), and the Conner's Continuous Performance Test II ("CPT II"). Id. at 4-5. The Memory Test revealed "impaired short term memory;" plaintiff failed the Digits Span Tests; plaintiff's score of 38 on the BDI indicated a "severe degree of depression[, which] justifies psychotherapy with medication;" and the CPT II indicated "a severe attention disorder, with a pattern similar to that seen in neurological conditions." Id. Dr. Kuhn used the Diagnostic and Statistical Manual of Mental

_____

[16] Plaintiff submits a sworn affidavit of Dr. Kuhn as Exhibit A, in which the doctor "swear[s] to the truth of my medical reports which are annexed regarding Ms. Batsayeva [sic]," including medical reports and workers' compensation forms filled out on plaintiff's behalf. Pl. Exh. A., Kuhn Affidavit ¶ 9. Although Dr. Kuhn's reports are all unsworn, they are still considered admissible for purposes of this summary judgment motion. See discussion and cases cited, supra note 4.

Disorders ("DSM") "multi-axial" system to diagnose plaintiff as totally disabled.[17] See id. at 6.
Dr. Kuhn diagnosed plaintiff with:

> Axis I – Depressive Disorder, secondary to a traumatic Brain Injury and chronic physical disability. Attention, memory and cognitive disorder, NOS [(not otherwise specified)], Post Traumatic Stress Disorder [("PTSD")].
> Axis II – Personality changes NOS [(not otherwise specified)]
> Axis III – Post Concussion Encephalopathy, Status post Traumatic Brain Injury with a loss of Consciousness, Lumbar disc herniation and lower back pain syndrome
> Axis IV – Patient has financial strssors [sic]
> Axis V – GAF [(Global Assessment of Function Scale)]=50[18]

Id. Based on plaintiff's medical records, Dr. Kuhn's finding of a "lack of prior contributory and relevant medical history." and the "neuropsychiatric and medical symptoms that developed subsequent to the injury," the doctor "determined with a high degree of medical certainty that the patient's current disability was caused by the injuries" she suffered on January 4, 2008. Id.

The treatment plan proposed and ultimately implemented by Dr. Kuhn included "rehabilitative Psychotherapy, including neurotraining and psychotropic medications as required in order to enhance [plaintiff's] attention, memory and cognitive function, sleep, depression pain tolerance." Id. Notes from weekly appointments between August 6, 2010 and January 6, 2011 reveal that in that time period, Dr. Kuhn prescribed plaintiff a combination of Adderall, Ambien, Cymbalta, Cerafolin, Diazepam, Celexa, and Valium in varying doses. See ECF Docket # 30-7, Pl. Exh. G., Kuhn Workers' Compensation Notes, 8/6/2010-1/6/2011. The notes also reinforce in detail plaintiff's continuing condition: chronic, distracting pain over her body; nightmares, vertigo, and dizziness; diminished capacity or inability to do household chores; a preference for

---

[17] DSM diagnoses and prognoses from psychiatric treating sources fall into one or more of five "axes:" Axis I – Mental Disorders; Axis II – Developmental Disorders and Personality Disorders, Axis III – Physical Disorders and Conditions; Axis IV – Severity of Psychosocial Stressors; and Axis V – Global Assessment of Functioning or GAF. AM. PSYCHIATRIC ASSOC., DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., text rev. 2000).

[18] According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, a GAF score of 50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." AM. PSYCHIATRIC ASSOC., DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., text rev. 2000).

staying at home; difficulty traveling; and profound depression and anxiety. Id. Dr. Kuhn, like plaintiff's other doctors also filed Workers' Compensation Forms, all of which stated that plaintiff's "complaints [were] consistent with his/her history of the injury/illness;" that plaintiff's "history of the injury/illness [was] consistent with [Dr. Kuhn's] objective findings;" and that plaintiff was 100% "temporar[ily] impair[ed]." ECF Docket # 30-7, Pl. Exh. G., Kuhn Workers' Compensation Forms, 9/16/2009-1/6/2011.

E. Current Condition of Plaintiff (As of Early 2011)

Plaintiff never did return to work after the accident and has "not worked at all since that date." Pl. Aff. ¶ 4. According to plaintiff, "I can't work because since the date of the accident, to present, I have headaches while sleeping, insomnia, dizziness. My back hurts when I sit, walk or stand for over 20 minutes. I cannot concentrate mentally. I have poor memory, can't remember daily items, I can't work as a home attendant. I can't lift or push a client patient, I can't cook, vacuum clean, shop for groceries, at work with a client . . . without pain in my back and body, all movement is with great difficulty. . . . I am totally disabled at present." Pl. Aff. ¶¶ 6-7. Plaintiff attempted to return to work in 2009 through a "vocational training" program of the New York University Rusk Institute of Rehabilitation Medicine and again at Omega Health Care, but "[p]laintiff failed at both, couldn't work – pain back, head, body, etc." Pl. Inter. ¶ 9; see also Pl. Dep. at 118-121. Home life, according to plaintiff, was no easier.

> At present my back pain begins when I start walking, carrying, moving, which limits all my activities in life. . . . I can't do anything much for myself or my children. I can't play music/keyboard anymore, I can't take care of myself or my children. I need help for my physical daily activities, I hear voices in my head, I feel that my head is stuffed. . . . I am tired. I nap for hours daily. As I do not have energy. . . . I try to be well and healthy but I can't get better. I feel very old for my age. I am alone, and feel alone from my family and children, and all social activity. . . . I have lost the enjoyment of life."

Pl. Aff. ¶¶ 9-12; see also Pl. Dep. at 121.

As of January 2011, plaintiff was seeing psychiatrist Dr. Kuhn for "brain therapy to calm my nerves and brain," and a physician named Doctor Levinson,[19] who "prescribed pain killers for me and and [sic] exercises to stop back pain which I do twice daily." Pl. Aff. ¶ 8. On March 3, 2011, the Social Security Administration adjudged plaintiff to have "been disabled from January 4, 2008, through the date of this decision," and eligible for Social Security Insurance benefits. ECF Docket # 35, Social Security Order of Administrative Law Judge at 2.

F. Procedural History

Plaintiff initially filed her complaint on August 24, 2009 in New York Supreme Court in Kings County. The case was properly removed on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) on November 10, 2009. See ECF Docket # 1. On December 29, 2010, defendants filed a motion for summary judgment, plaintiff filed their opposition shortly thereafter, and defendants replied on February 18, 2011. ECF Docket # 34.

## II. DISCUSSION

A. Legal Standard

Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir. 2009) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 255 (1986)). The party opposing summary judgment must set forth evidence demonstrating a genuine issue for trial, and may not rely only on allegations in its pleadings. Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) ("[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its

---

[19] Dr. Levinson's reports and diagnoses are not included herein because they are not accompanied by a sworn affidavit and are, therefore, inadmissible.

burden on summary judgment."). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

### B. New York No-Fault Insurance Law

#### 1. General Principles

State law governs diversity actions and there is no dispute that New York law governs this case. Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). Defendants do not move for summary judgment on the issue of liability, and rightfully so given the highly factual nature of the accident and disagreements over what actually occurred. See, e.g., Mangual v. Pleas, No. 02 Civ. 8311(CBM), 2004 WL 736817, at *3 (S.D.N.Y. Apr. 6, 2004) (Motley, J.) ("Sharp conflicts of evidence . . . regarding the circumstances of a vehicle collision present questions of fact and credibility that properly belong to the jury.") (citing Campbell v. Driscoll, 593 N.Y.S.2d 549, 549 (N.Y. App. Div. 1993)). Instead, defendants argue that summary judgment should be granted because plaintiff did not sustain a "serious injury," as defined under New York's No Fault Insurance Law, N.Y. Ins. Law § 5102(d) (McKinney 2006).

Under New York's No Fault Insurance Law, there is no right to recovery in tort for non-economic loss resulting from an automobile accident unless a covered person sustained a "serious injury." N.Y. Ins. Law § 5104(a) (McKinney 2009).[20] Whether the claimed injury is "serious" is a threshold matter of law for the court to decide. Licari v. Elliott, 441 N.E.2d 1088,

---

[20] Under New York's No Fault Insurance Law, a plaintiff may also assert a claim for damages based on economic loss, but he must plead that he suffered more than a "basic economic loss" (i.e. in excess of $50,000) to avoid the preclusive effect of the law. N.Y. Ins. Law §§ 5104(a) ("[T]here shall be no right of recovery for . . . basic economic loss."), 5102(a) ("'Basic economic loss' means, up to fifty thousand dollars per person . . ..."). The defendants do not challenge that plaintiff properly asserts a claim for more than "basic economic loss" and does not move for summary judgment on this ground.

1091 (N.Y. 1982) ("It is incumbent upon the court to decide in the first instance whether plaintiff has a cause of action to assert within the meaning of the statute.").

There are nine distinct categories of "serious injury" under New York law, only three of which are claimed by plaintiff here and thus relevant to the instant action. A personal injury is considered "serious" under New York law when it "results in . . . [(1)] permanent loss of use of a body organ, member, function or system [(hereinafter "permanent loss claim")]; . . . [(2)] significant limitation of use of a body function or system [(hereinafter "significant limitation claim")]; or [(3)] a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred and eighty days immediately following the occurrence of the injury or impairment [(hereinafter "90/180 claim")]." N.Y. Ins. Law § 5102(d). "Serious injur[ies]" are not limited to physical injuries alone: "[A] causally-related *emotional injury, alone* or in combination with a physical injury, can constitute a serious injury . . .." Taranto v. McCaffrey, 835 N.Y.S.2d 365, 366 (N.Y. App. Div. 2007) (emphasis added) (internal quotations and citations omitted).

Where, as here, the defendant moves for summary judgment for lack of "serious injury," the Court must engage in the familiar "burden-shifting scheme," recently endorsed by the Second Circuit:

> [A] defendant must establish a prima facie case that plaintiff did not sustain a "serious injury" within the meaning of Insurance Law § 5102(d). In support of its argument that there is no such serious injury, defendant may rely on the unsworn reports by plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits. Once a defendant's burden is met, the plaintiff is then required to establish a prima facie case that he sustained a serious injury. For plaintiff to defeat a summary judgment motion, admissible evidence must be presented in the form of sworn affidavits by physicians.

Yong Qin Luo v. Mikel, 625 F.3d 772, 777 (2d Cir. 2010) (quoting Barth v. Harris, No. 00 Civ. 1658(CM), 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001) (McMahon, J.)). Once a defendant has discharged his *prima facie* burden, no matter the underlying category of claimed "serious injury," a "Plaintiff must present objective proof of injury, as subjective complaints of pain will not, standing alone, support a claim for serious injury." Id. at 777. Nevertheless, plaintiff's subjective evidence and complaints are not irrelevant and may be considered alongside objective evidence to determine whether plaintiff raises a genuine issue of material fact as to "serious injury." Id. at 778.

### 2. Evidence Presented

In support of their motion for summary judgment, defendants proffer, in pertinent part, plaintiff's deposition, plaintiff's Lutheran records, various unsworn medical records of plaintiff, and sworn reports of two of its own physicians: Radiologist, David A. Fisher, M.D. ("Dr. Fisher"), ECF Docket # 34-2 at 27-28, Def. Exh. H. ("Fisher Report"), and Board Certified Neurologist, Jerome M. Block, M.D. ("Dr. Block"), ECF Docket # 34-2 at 12-25, Def. Exh. G. ("Block Report").[21]

Dr. Fisher reviewed the MRI of plaintiff's cervical spine taken on April 2, 2008 and the MRI of plaintiff's lumbar spine taken on March 16, 2009. See Fisher Report. Dr. Fisher did not conduct any physical examination of plaintiff and the record does not indicate that he reviewed any other medical records. See id. Regarding the cervical spine, Dr. Fisher concluded:

---

[21] Although neither of defendants' physician's reports are accompanied by a "sworn affidavit[]," Yong Qin Luo, 625 F.3d at 777, both reports are affirmed under the penalties of perjury and thus carry the "like force and effect" of a sworn affidavit. See 28 U.S.C. § 1746 ("Wherever . . . any matter is required . . . to be supported . . . or proved by . . . sworn . . . affidavit, . . . such matter may, with like force and effect, be supported . . . by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury . . .."); see, e.g., Williams v. Elzy, No. 00 Civ. 5382(HBP), 2003 WL 22208349, at *5 (S.D.N.Y. Sept. 23, 2003) (Pitman, J.) (holding unsworn declaration, as opposed to an affidavit sworn to before a notary public, admissible to prove "serious injury" under 28 U.S.C. § 1746).

> There is clear evidence of degenerative changes throughout . . . most pronounced at the C5/6 and C6/7 levels. These changes are *unlikely* to have developed in the short interval between the accident and the study and in my opinion represent a pre-existing condition. . . . The disc bulges noted are compatible with the amount of degenerative change present.

Id. at 1 (emphasis added). Regarding the lumbar spine, Dr. Fisher concluded:

> The disc herniation noted at L1/2 is compatible with the amount of degenerative change present. This is non-specific and *could be traumatic or degenerative* in nature.

Id. at 2 (emphasis added).

Dr. Block conducted a full physical and neurological examination of plaintiff in May 2010 and reviewed plaintiff's medical records and doctor's reports described at length, supra Part I. Dr. Block conducted ROM testing on plaintiff's cervical and lumbar spine, as well as her legs and concluded:

> With bilateral straight leg raising at 90 degrees she reports some mild ache in the popliteal space of either leg. Her spinal curvatures are well preserved. She showed full and painless cervical and lumbar ranges of motion except for report of discomfort with full lumbar extension. I find no evidence of paravertebral muscle spasm, trigger points, elicitable Tinel's sign over the superficial nerves, pain over sciatic nerves, notches or brachial plexii. Function of the autonomic nervous system is entirely normal . . ..

Block Report at 8. He further noted that during the examination, plaintiff . . .

> . . . showed no signs of pain or discomfort. Her movements were easy in sitting, rising, turning and looking about the room. There was no pain on palpation of multiple muscle groups. . . . She showed supple and full ranges of motion through the spinal column.

Id. at 8. Dr. Block found "no evidence of fibromyalgia," no evidence of any nervous system dysfunction, "no objective evidence of neurological dysfunction," "no sign of traumatic brain injury," and "no continuing neurological abnormality." Id. Dr. Block did not rule out post-concussion syndrome, noting that "[a]ny concussive injury would have been mild. If present at all, symptoms would long since have resolved." Id. As to plaintiff's depression, Dr. Block conceded that "[t]here may be some posttraumatic depression," but then opined that the

depression "may well have" been due to plaintiff's divorce and having to yell at her children occasionally. Id.

In opposition to defendants' motion for summary judgment, plaintiff submits her own sworn affidavit, as well as the sworn affidavits of Drs. Miller, Neystat, and Kuhn, incorporating the findings and conclusions of all of their medical records and workers' compensation forms described at length, supra Part I.

### C. "Serious Injury" Claims
#### 1. Permanent Loss

Plaintiff asserts that her cervical and lumbar spine injuries, head injuries, emotional injuries, and her ongoing pain and various other symptoms constitute a "permanent loss of use of a body organ, member, function or system." N.Y. Ins. Law § 5102(d); Opp. Mem. ¶ 2; Compl. ¶ 19-20. Dr. Block's report, based on his thorough review of plaintiff's medical record, as well as his physical examination, is sufficient to show *prima facie* that plaintiff's alleged physical injuries were not permanent in nature. The physical examination revealed full ROM in the lumbar and cervical spine with minimal pain, no evidence of any "traumatic brain injury," and at least no "continuing" neurological problems. Block Report at 8. However, defendants failed to show *prima facie* that plaintiff's depression and other emotional injuries are not permanent. Dr. Block acknowledged, based upon an examination he conducted more than two years after the accident, "[t]here may be some posttraumatic depression" and gave no indication when or if plaintiff's depression would ever subside.[22] Id. Even so, plaintiff submitted sufficient admissible, objective, and recent proof to show *prima facie* that all of her alleged injuries, including depression, may be permanent in nature so as to defeat summary judgment.

---

[22] I address the issue of causation infra Part II.C.4.

To prove permanence, "it is not necessary to prove a total loss of the affected function or system, but it is still necessary to submit proof that it operates in some limited way, or operates only with pain." Booker v. Miller, 685 N.Y.S.2d 837, 837 (N.Y. App. Div. 1999) (internal quotations omitted); see also Paolini v. Sienkiewicz, 691 N.Y.S.2d 836, 837 (N.Y. App. Div. 1999) ("When permanence is shown, the significance of the resulting curtailment is not material . . . as long as it involves some actual limitation of use.") (internal quotations omitted). "[P]ermanent pain, even of an intermittent character, may form the basis of a 'serious injury . . .'" Dwyer v. Tracey, 480 N.Y.S.2d 781, 781 (N.Y. App. Div. 1984). Nevertheless, in order to show *prima face* permanent loss of use under an intermittent pain theory, a "plaintiff's pain [must be] more than minor or involve[] at least some restriction of motion." Barth, 2001 WL 736802 at *11 (citing, among other cases, Cole v. United States, No. 85 Civ. 5295 (BN)(KTD), 1986 WL 5805, at *8 (S.D.N.Y. May 16, 1986) (Newman, J.) (finding *prima facie* showing by plaintiff where there was mild impairment and restriction of movement in addition to pain). Moreover, to prove permanence, plaintiff must not rely solely on past evaluations as "a recent medical examination substantiates, or, at the very least, purports to substantiate, that portion of a plaintiff's serious injury claim which alleges some sort of permanent or significant injury—that is, an injury which has an extended *duration* element." Troutovski v. Sitnir, 687 N.Y.S.2d 534, 535 (N.Y. Civ. Ct. 1999) (emphasis in original). "Conversely, the absence of proof of a recent medical examination leaves an important evidentiary vacuum in a plaintiff's opposition to a motion for summary judgment, where the plaintiff is claiming some form of permanent or significant injury." Id.

Here, plaintiff, through the sworn affidavits of three doctors, proffers MRIs showing disk herniation and bulging, the existence of which was confirmed by defendants' own medical

expert, Dr. Fisher. See Fisher Report at 1-2.[23] Although the existence of herniated and/or bulging disks confirmed by MRIs alone are insufficient "without additional objective medical evidence establishing that the accident resulted" in a permanent injury, Pommells v. Perez, 4 N.Y.3d 566, 574 (N.Y. 2005), plaintiff has also submitted relatively recent (September 2009) ROM testing by Dr. Neystat's office which showed continued significant limitations nearly two years after the accident. Pl. Exh. E., 9/10/2009 Physical Therapy Follow-Up Report at 2. Dr. Neystat's workers' compensation records, as recent as November 2009, indicated that plaintiff's injuries were "permanent." Pl. Exh. E., Neystat Workers' Compensation Forms, 11/2/2009. Based on recent objective physical and psychiatric testing, Dr. Kuhn diagnosed plaintiff with—among other injuries—"depressive disorder, secondary to traumatic brain injury and chronic physical disability," as well as "post-concussion encephalopathy, status post traumatic brain injury with a loss of consciousness. Pl. Exh. A., Kuhn Initial Neuropsychiatric at 6. Although defendants note that Dr. Kuhn's initial psychological evaluation indicates that at least as of July 13, 2009, the duration of plaintiff' disability was "[u]ndetermined," Id., Dr. Kuhn's weekly treatment notes reflect that plaintiff was still experiencing near-constant and severe pain throughout her body and ongoing depression and anxiety at least through January 2011. See Pl. Exh. G., Kuhn Workers' Compensation Notes, 8/6/10-1/6/2011. Dr. Kuhn never ruled out permanency. See id. The foregoing objective evidence in combination with plaintiff's subjective complaints of ongoing, permanent, and severe physical and emotional injuries is sufficient to show *prima facie* that plaintiff has suffered "serious injur[ies]" to survive summary judgment on her Permanent Loss Claim.

### 2.   Significant Limitation Claim

---

[23] I address the issue of degeneration infra Part II.C.4.

Plaintiff additionally asserts that her alleged injuries constitute a "significant limitation of use of a body function or system." N.Y. Ins. Law § 5102(d); Opp. Mem. ¶ 2; Compl. ¶ 20. For substantially the same reasons just discussed, supra Part II.C.1, Dr. Block's report is both sufficient to show *prima facie* that plaintiff's alleged physical injuries did not result in a "significant limitation," yet insufficient to show *prima facie* that plaintiff's alleged depression and other emotional injuries did not result in a "significant limitation." In any event, plaintiff has again submitted admissible and objective proof to show *prima facie* that all of her alleged injuries has resulted in "significant limitation," sufficient to defeat summary judgment.

In order to show *prima facie* "significant limitation" a plaintiff must prove "significant limitation in both degree and duration." Gualtieri v. Farina, 283 F.Supp.2d 917, 925 (S.D.N.Y. 2003) (Conner, J.) (granting summary judgment where plaintiff proved degree, but not duration of the significant limitation) (citing Petrone v. Thornton, 561 N.Y.S.2d 49, 50 (N.Y. App. Div. 1990)); see also Jones v. United States, 408 F.Supp.2d 107, 120 (E.D.N.Y. 2006) (Azrack, J.) (granting summary judgment where "plaintiff's neck and back functions were both slight and *short-term*.") (emphasis added). "[T]he word 'significant' . . . should be construed to mean something more than a minor limitation of use. . . [A] minor, mild or slight limitation of use should be classified as insignificant within the meaning of the statute." Licari, 441 N.E.2d at 1091.

Soft tissue injury claims—i.e. herniated and bulging lumbar and cervical disks— "commonly fall" under the "significant limitation" category. Pommells, 4 N.Y.3d at 571. "In order to prove the extent or degree of physical limitation, an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury." Toure v. Avis Rent A Car Sys., Inc., 774 N.E.2d 1197, 1200 (N.Y. 2002). "While there

is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes." Hodder v. United States, 328 F.Supp.2d 335, 356 (E.D.N.Y. 2004) (Pollak, J.) (citing cases).

Here, plaintiff tenders admissible evidence to show both the degree and duration of her soft tissue injuries. Plaintiff's MRI and EMG findings, in combination with detailed ROM testing executed over the course of nearly two years by two different doctors, evidencing losses in ROM of consistently greater than 20%, are more than sufficient to discharge plaintiff's *prima facie* rebuttal burden. See, e.g., Tenzen v. Hirschfeld, No. 10-cv-50, 2011 WL 6034462, at *7 (E.D.N.Y. Dec. 5, 2011) (Glasser, J.) ("[S]pecific, numeric measurements of [plaintiff's] loss of range of motion as a result of the accident . . . [t]aken together with evidence of a herniated disk recorded by the MRI . . . raise[d] genuine issues of material fact."); Persaud v. URS Midwest, Inc., No. 06 CV 3119(JG)(JMA), 2007 WL 4556908, at *7 (E.D.N.Y. Dec. 21, 2007) (Gleeson, J.) (finding sufficient to survive summary judgment MRI evidence of herniated disc in combination with sworn "test results showing that over time [plaintiff's] range of motion of the cervical and lumbar spine diminished to a significant degree"). That plaintiff's doctors' objective ROM findings shifted and varied over time and were also inconsistent with Dr. Block's findings, only further "supports the conclusion that summary judgment would be inappropriate at this time." Ahmed v. H E Transp., Inc., No. 06 CV 2938(CLP), 2008 WL 520244, at *10 (E.D.N.Y. Feb. 26, 2008) (Pollak, J.). These objective findings, in combination with plaintiff's subjective complaints of pain and inability to work, study, or perform household chores, show that plaintiff has raised a triable issue of fact as to "significant limitation."

Plaintiff has also proven a degree and duration of emotional injury sufficient to defeat defendants' summary judgment motion. Plaintiff was diagnosed by Dr. Miller as early as January 2008 and by Dr. Neystat in January 2009 with depression and anxiety as a result of the accident. Although these diagnoses are arguably insufficient as they were not based on any explicit objective testing, Dr. Kuhn's more recent, detailed diagnoses of severe emotional trauma in mid-2009, which confirmed Dr. Miller's and Neystat's observations, as well as plaintiff's complaints, were based upon wide-ranging objective testing taking place over the course of three 75-minute examination periods. Cf. Villeda v. Cassas, 871 N.Y.S.2d 167, 168 (N.Y. App. Div. 2008) (finding plaintiff failed to raise triable issue of fact as to emotional harm where diagnosis was "based only upon the plaintiff's subjective complaints, as all admissible objective test results were normal or inconclusive."). According to Dr. Kuhn's records, Plaintiff's emotional injuries not only lasted to at least January 2011, but were still very severe at that point. See Pl. Exh. G., Kuhn Workers' Compensation Notes, 1/6/2011. For the foregoing reasons, plaintiff has carried her burden to show *prima facie* that she has suffered serious emotional injuries to survive summary judgment under her Significant Limitation claim.

### 3.   90/180 Claim

Lastly, plaintiff asserts that her injuries "prevent[ed] [her] . . . from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred and eighty days immediately following the occurrence of the injury or impairment." N.Y. Ins. Law § 5102(d); Opp. Mem. ¶ 2; Compl. ¶ 20. Defendants have failed to discharge their *prima facie* burden to disprove this claim. Dr. Block's report only speaks to the condition of plaintiff in May 2010, two and one-half years after the subject accident, "not plaintiff's condition during the six months immediately after the

accident." Quinones v. Ksieniewicz, 915 N.Y.S.2d 70, 71 (N.Y. App. Div. 2011) ("[D]efendants failed to establish prima facie that plaintiff did not sustain [90/180 injury]" where "[t]he reports of defendants' medical experts were based on examinations of plaintiff conducted nearly two years after the subject accident.").

Nevertheless, defendants argue that plaintiff's 90/180 claim should be dismissed because plaintiff "was enrolled as a full-time student for 74 of the first 90 days immediately following the accident," and "[s]ince the accident . . . completed a day-long orientation seminar . . . and a vocational training program . . .." Def. Reply. at 4-5. First, under New York Insurance Law, plaintiff need not show that she was prevented from "performing substantially all" customary material activities for the first ninety days *immediately subsequent* to the accident; rather, she only need show that such circumstances existed for "not less than ninety days *during* the one hundred and eighty days immediately following the occurrence." N.Y. Ins. Law § 5102(d) (emphasis added). Even if plaintiff's school attendance were sufficient in itself to disprove her 90/180 claim, there is no dispute that she withdrew from school following the semester and thus for at least ninety days during the first one hundred and eighty days following the accident did not attend school. Second, plaintiff's attempts to return to the work force as evidenced by the Omega Health Care orientation and vocational training through the Rusk Institute, both occurred in 2009, long after "one hundred and eighty days immediately following the occurrence." N.Y. Ins. Law § 5102(d). These failed attempts to return to work are thus irrelevant to this claim.

Lastly, defendants attempt to characterize plaintiff's alleged inability to work during the first one-hundred-and-eighty days as an inability only "to continue the job she previously held [because] [t]he woman she had been assisting had moved into a nursing home, rendering plaintiff's previous job unavailable." Def. Reply at 5. However, plaintiff's sworn workers'

compensation records from three different doctors all confirm that plaintiff's disability was "total" and that she was unable to do "*any* type of work." Yet even if defendants had discharged their *prima facie* burden, plaintiff has again submitted sufficient admissible and objective proof to show *prima facie* that defendants' motion for summary judgment should be denied on this claim.

In adjudicating a 90/180 claim, "the words 'substantially all' should be construed to mean that the person has been curtailed from performing his usual activities to a great extent rather than some slight curtailment." Licari, 441 N.E.2d at 1091. A plaintiff's inability to work, whether or not she can perform other "usual activities" is sufficient alone to make out a *prima facie* 90/180 claim. See Mercado v. Lee, No. 04 Civ. 7166(PGG), 2008 WL 4963985, at *5 (S.D.N.Y. Nov. 21, 2008) (Gardephe, J.) ("[A]n inability to work is a limit on 'substantially all' of a plaintiff's customary activities . . ..."). Nevertheless, plaintiff's claimed inability to work must be substantiated by objective medical evidence. Jackson v. New York City Trans. Auth., 708 N.Y.S.2d 469, 470 (N.Y. App. Div. 2000) ("[P]laintiff's self-serving affidavit stating that she was unable to return to work . . . without a physician's affidavit substantiating the existence of a medically determined injury which caused the alleged limitation of her activities [i]s insufficient" to make out a 90/180 claim); see also Tenzen, 2011 WL 6034462 at *8 (no 90/180 showing where "[p]laintiff did not submit any medical evidence that she [wa]s unable to conduct ordinary activities or must restrict her physical activities in any way.").

Here, Dr. Miller's affidavit and supporting documentation incorporated by reference is more than sufficient to support a *prima facie* 90/180 claim. Dr. Miller saw plaintiff five days after the accident, ordered plaintiff to attend physical therapy, ordered plaintiff to refrain from "heavy work," and soon after affirmed that she was unable to do any work. Dr. Kuhn saw

plaintiff regularly over the course of the first one hundred and eighty days post-accident and continued to reinforce his diagnoses and treatment plan. Furthermore, plaintiff testified (through her deposition and affidavit) that she did not and could not return to work and was severely limited in her daily activities for ninety of the first "one hundred and eighty days immediately following the occurrence" to the present. <u>Compare</u> <u>Yong Qin Luo</u>, 625 F.3d at 778 (denying summary judgment where plaintiff provided proof that doctor "limited plaintiff's return to work to *light duty*[,] . . . [p]laintiff attended physical therapy for at least three months following the surgery[,] . . . and plaintiff testified that "she was unable for a number of months following the accident to, *inter alia*, return to work, leave her home, attend continuing education and English classes, and engage in other normal activities . . ..") (emphasis added); <u>with</u> <u>Licari</u>, 441 N.E.2d at 1092 (grating summary judgment where "it is undisputed . . . that plaintiff returned to work 24 days after the accident and that upon his return he immediately resumed his usual schedule . . . was able to maintain his daily routine for most of each day after returning to work . . . [and] offered no proof that his ['occasional, transitory'] headaches in any way incapacitated him or interfered with his ability to work or engage in activities at home."); <u>Tenzen</u>, 2011 WL 6034462 at *8 ("[Plaintiff's] usual activities were impeded slightly . . . [she] returned to work the day after the accident, was not absent any days during the first 180 days following the accident, and continues to maintain her position as a retail administrator."); <u>Pierre v. Nanton</u>, 719 N.Y.S.2d 706, 706 (N.Y. App. Div. 2001) ("Although the plaintiff claimed that he did not work for almost four months after the accident [as a result of disc herniation], he was *not ordered by a doctor* to stay home.") (emphasis added).

For the foregoing reasons, plaintiff has carried her burden to show *prima facie* that she has suffered "serious injur[ies]" under a 90/180 claim.

4. Causation

Defendants argue that even if plaintiff proffered sufficient evidence to show *prima facie* "serious injury" plaintiff's injuries are not the result of the accident. "Even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as . . . a preexisting condition—summary dismissal of the complaint may be appropriate." Pommells, 4 N.Y.3d at 572.

Defendants proffer Dr. Fisher's MRI findings to show that plaintiff's conditions were degenerative in nature and not caused by the accident. However, the New York Court of Appeals has already held that a defendant's allegations of a pre-existing condition based solely upon the defendant's radiologist's "conclusory notation" of a degenerative condition following review of an MRI and nothing more is "itself insufficient to establish that plaintiff's pain might be chronic and unrelated to the accident." Id. at 577-79, 580 (comparing another joined case, in which defendants proffered "persuasive" evidence of "preexisting degenerative disc condition" where defendants' expert had "*physically examin[ed]* plaintiff and review[ed] prior medical records, including MRI's and x-rays" and plaintiff's own treating physician found degenerative conditions) (emphasis added); see also Gay v. Cevallos, No. 10 Civ. 949(LMM), 2011 WL 2015528, at *5 (S.D.N.Y. May 17, 2011) (McKenna, J.) (finding pre-existing condition where defense experts, based upon review of both MRI *and physical examination*, found degenerative condition, and both of plaintiff's experts conceded the existence of degenerative condition).

Moreover, Dr. Fisher's findings are themselves inconclusive on the issue of causation and thus have the opposite affect intended by defendants: they actually raise a material issue of fact for trial. Dr. Fisher opined only that it is "*unlikely*" that the changes in the cervical spine had "developed in the short interval between the accident and the study," and that the lumbar disc

herniation "is non-specific and *could be traumatic* or degenerative in nature." Fisher Report at 1-2 (emphasis added). Similarly, Dr. Block did not rule out the possibility that plaintiff's depression was caused by the accident. See Block Report at 8 ("There *may be some* posttraumatic depression.") (emphasis added). Where, as here, the defendants have not proffered persuasive and/or conclusive evidence of preexisting condition, the plaintiff is "not obliged" to specifically rebut defendants' contention. Cf. Valentin v. Pomilla, 873 N.Y.S.2d 537, 538 (N.Y. App. Div. 2009) (finding prima facie lack of causation where MRI revealed "*no evidence* of post-traumatic injury to the disc structures" and both of plaintiff's experts found "preexisting degenerative changes"); Gay, 2011 WL 2015528 at *3 (prima facie lack of causation where MRI and physical examinations "showed *nothing more* than pre-existing pathology[,]" "*could not be* attributed to a single accident[,]" "were *considerably* more long-standing than three to four weeks in duration," and revealed "*no evidence* of trauma-related derangement").

Defendants, however, claim that plaintiff's experts' opinions as to causation are merely "conclusory" and solely based on plaintiff's subjective complaints. See Def. Reply at 9-15. "Absent an explanation of the basis for concluding that the injury was caused by the accident, as opposed to other possibilities evidenced in the record, an expert's conclusion that plaintiff's condition is causally related to the subject accident is mere speculation, insufficient to support a finding that such a causal link exists." Valentin, 873 NY.S.2d at 539. However, plaintiff's experts' opinions on causation were based on thorough, objective, and repeated physical and neurological examinations, review of MRIs, and other diagnostic tests and medical records. These examinations and reviews confirmed, rather than relied solely upon, plaintiff's statements that she had no relevant past medical history, surgeries, or pre-existing conditions, which already

comported with the findings of Lutheran upon intake and the fact that the plaintiff had not previously taken any medications. See supra note 2 and accompanying discussion.

The fact that plaintiff did not see Dr. Kuhn "until a year and a half after the accident," does not mean that Dr. Kuhn "may not give an opinion as to the causation of the alleged lumbar herniated disc or alleged psychological injury," Def. Reply at 9, as defendants urge. To the contrary, the time-lapse between an accident and a doctor's conclusions of the seriousness and/or causation of injuries does not diminish the force of the doctor's findings where they are "based not only on . . . physical examinations, but on review of the medical records made in connection with his alleged injuries." Barth, 2001 WL 736802 at *3 (two year time lapse). Such is the case here.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
       January 20, 2012

                                    s/ Judge Raymond J. Dearie
                                    _____
                                    RAYMOND J. DEARIE
                                    United States District Judge